*Attorney Grievance Commission v. Chauncey Bayarculus Johnson*
AG No. 63, September Term 2018


**ATTORNEY DISCIPLINE – SANCTION – INDEFINITE SUSPENSION**

Respondent, Chauncey Bayarculus Johnson, violated several provisions of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC"), the Maryland Attorneys' Rules of Professional Conduct ("MARPC"), and the Maryland Rules when he failed to maintain an attorney trust account, failed to timely remit funds due to clients, failed to safeguard client funds, failed to maintain his trust obligations to clients, made misrepresentations to clients, and commingled funds.

Mr. Johnson's conduct violated the following rules of professional conduct: 1.1 (Competence); 1.4 (Communication); 1.15 (Safekeeping Property); and 8.4 (Misconduct). Mr. Johnson's conduct also violated the following Maryland Rules: 16-603 (Duty to Maintain Account); 16-604 (Trust Account—Required Deposits); 19-408 (Commingling of Funds); and 19-410 (Prohibited Transactions). This misconduct warrants an indefinite suspension with the right to reapply after one year, providing that Mr. Johnson completes a course emphasizing the responsible maintenance of an attorney trust account.

Circuit Court for Prince George's County
Case No. CAE19-09143
Argued: October 29, 2020

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG. No. 63

September Term, 2018

———————————————————

ATTORNEY GRIEVANCE COMMISSION OF
MARYLAND

V.

CHAUNCEY BAYARCULUS JOHNSON

———————————————————

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth
Biran

JJ.

———————————————————

Opinion by Getty, J.
Watts, J., dissents.

———————————————————

Filed: March 16, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

> "Do the dull things right so the extraordinary things will not be required too often."
>
> George F. Will, Columnist – Describing the baseball philosophy of Baltimore Orioles manager Earl Weaver.[1]

Earl Weaver, famous for managing the Baltimore Orioles during their glory days, is often quoted about stressing the fundamentals of playing baseball. Much like in baseball, to properly maintain a law practice, a lawyer must execute basic fundamentals, some of which can, on a daily basis, be dull and monotonous. Establishing and maintaining an attorney trust account requires devoting time and attention to minute details but is fundamental to complying with the Maryland Attorneys' Rules of Professional Conduct. Maintaining strong communications with clients can be monotonous; supervising non-attorney staff can be difficult; and executing other client matters can be dull, but failure to do so can result in violations and misconduct under the rules. Weaver also said, "The key to winning baseball games is pitching, fundamentals, and three run homers."[2] However, for the Maryland attorney, it is all about the fundamentals.

---

[1] George F. Will, *Dry Your Eyes, Child*, Balt. Sun, Oct. 7, 1982, at A15. Earl Weaver served as manager of the Baltimore Orioles for seventeen years (1968–82; 1985–86). In describing Earl Weaver's management style, George F. Will also stated that "the secret of Oriole magic is attention to detail." *Id.*

[2] Baseball Almanac, *Quotes from Earl Weaver*, https://www.baseball-almanac.com/quotes/quoweav.shtml [https://perma.cc/DX6A-DVFL].

Throughout the course of numerous personal injury representations, Respondent, Chauncey Bayarculus Johnson, repeatedly failed to recognize the fundamentals of operating a Maryland law practice. Mr. Johnson operates a solo law practice in Prince George's County, Maryland, known as the Law Offices of Chauncey B. Johnson. Mr. Johnson transitioned from working as a schoolteacher to practicing law part-time in 2013, prior to becoming a full-time attorney shortly thereafter. During this transition, Mr. Johnson first transgressed by failing to maintain his client's settlement funds in an attorney trust account. Shortly after Mr. Johnson opened an attorney trust account, he alleges that his nephew and non-attorney employee—Romeo Clarke—began misappropriating client funds from that account with the intent to commit theft. The misappropriation of funds from Mr. Johnson's attorney trust account set off a wide-ranging pattern of misconduct spanning twenty-one personal injury clients. For the reasons discussed below, we shall indefinitely suspend Mr. Johnson from the practice of law, with the right to reapply after one year, providing that he completes a course emphasizing the responsible maintenance of an attorney trust account.

## BACKGROUND

### A. *Procedural Context.*

On February 19, 2019, the Attorney Grievance Commission of Maryland, acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action ("Petition") with the Court of Appeals alleging that Chauncey Bayarculus Johnson ("Mr. Johnson") had violated the Maryland Attorneys' Rules of Professional Conduct ("MARPC" or "Rules"),

the Maryland Rules, and Maryland Code (1989, 2018 Repl. Vol.) Bus. Occ. & Prof. ("BOP") § 10-306.[3] *See* Md. Rule 19-721.

The Petition concerned Mr. Johnson's failure to deposit client funds into an attorney trust account, several instances of financial mismanagement after Mr. Johnson opened an attorney trust account, commingling of funds, failure to supervise a non-attorney employee's handling of funds, failure to promptly remit funds due to clients, and misrepresentations to clients about their settlements. Based on this conduct, the Petition alleged that Mr. Johnson violated the following Rules: 1.1 (Competence); 1.4 (Communication); 1.15 (Safekeeping Property); 5.3 (Responsibilities Regarding Non-Attorney Assistants); 5.5[4] (Unauthorized Practice of Law); and 8.4 (Misconduct). The Petition also alleged violations of the following Maryland Rules: 16-603 (Duty to Maintain Account); 16-604 (Trust Account—Required Deposits); 16-607 and 19-408 (Commingling of Funds); and 16-609 and 19-410 (Prohibited Transactions).[5] Finally, the Petition alleged

---

[3] Effective July 1, 2016, the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") were renamed the Maryland Attorneys' Rules of Professional Conduct and recodified without substantive changes in Title 19 of the Maryland Rules. Since Mr. Johnson's misconduct occurred both before and after the recodification of the MLRPC, he committed violations of the same rules of professional conduct under both the MLRPC and the MARPC. For simplicity, and because there is no substantive difference in the two codifications of the rules, we shall use the shorter designations of the MLRPC, *e.g.*, "Rule 1.1."

[4] Bar Counsel later withdrew its allegation that Mr. Johnson violated Rule 5.5.

[5] Bar Counsel charged Mr. Johnson with violating Maryland Rules 16-603 and 16-604 based on conduct that occurred before July 1, 2016. Effective July 1, 2016, Title 16, Chapter 600 of the Maryland Rules were recodified, without subsequent change, in Title 19, Chapter 400. Rule 16-607 was recodified as Rule 19-408, and Rule 16-609 was

that Mr. Johnson violated § 10-306 of the Business Occupations and Professions Article of the Maryland Code. *See* BOP § 10-306 ("A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.").

We designated the Honorable Leo E. Green, Jr. of the Circuit Court for Prince George's County by Order dated March 6, 2019, to conduct an evidentiary hearing concerning the alleged violations and to provide findings of fact and recommend conclusions of law. *See* Md. Rule 19-722(a). Mr. Johnson was personally served with process on May 16, 2019, and, on May 22, 2019, this Court entered an Order reassigning the case to be heard by the Honorable Wytonja L. Curry (the "hearing judge").

The evidentiary hearing spanned six days: December 2, 3, 4, 5, 9, and 10, 2019. Three months after the hearing, on March 18, 2020, Mr. Johnson moved this Court to remand the case for the hearing judge to consider newly discovered evidence or alternatively to include newly discovered evidence in Mr. Johnson's exceptions to the hearing judge's finding of facts and conclusions of law. We denied Mr. Johnson's motion in an Order dated March 27, 2020. The hearing judge's findings of fact and conclusions of law were filed in this Court on March 23, 2020, and shortly thereafter, on March 31, 2020, Mr. Johnson moved this Court to reconsider its March 27 Order denying his Motion for Leave to Remand. We denied Mr. Johnson's Motion for Reconsideration in an Order dated April 9, 2020. Mr. Johnson filed exceptions to the hearing judge's findings of fact

---

recodified as Rule 19-410. Because Mr. Johnson's misconduct under Rules 16-607 and 16-609 occurred both before and after July 1, 2016, Bar Counsel charged Mr. Johnson with violating both versions of the Rules.

4

and recommended conclusions of law on April 23, 2020, and this Court heard oral argument in this matter on October 29, 2020.

## B. Factual Findings.

We begin by summarizing the hearing judge's factual findings. Mr. Johnson is originally from Liberia and immigrated to the United States in 1991. He received degrees in engineering and biochemistry from the University of Maryland at College Park. He also completed a teaching certificate in science and math, after which he spent several years working as a teacher. Mr. Johnson then attended the University of Maryland School of Law and, after graduating, was admitted to the Maryland Bar on June 20, 2001. Mr. Johnson did not immediately begin practicing law upon admission to the bar and continued working as a teacher for several years before practicing law part-time in 2013. Sometime between December 2014 and October 2015, Mr. Johnson began practicing law full-time.[6] At all relevant times, Mr. Johnson maintained a law office—the Law Offices of Chauncey B. Johnson. Mr. Johnson's law practice first operated from his home address in Fort Washington, Maryland, and he later opened an office in National Harbor, Maryland.

In this matter, the hearing judge first made factual findings involving Mr. Johnson's failure to maintain an attorney trust account or IOLTA account between 2013 and October

---

[6] The hearing judge's findings of fact and conclusions of law are unclear as to when exactly Mr. Johnson began working as a full-time attorney. The hearing judge first noted that, "by December 2014, [Mr. Johnson] was no longer working as a part[-]time attorney[.]" However, two sentences later, the hearing judge determined that "[Mr. Johnson] began the full-time practice of law in 2015." Mr. Johnson's testimony at the evidentiary hearing indicates that he transitioned to the full-time practice of law sometime in the middle of 2015.

5

2015. Then, the hearing judge made factual findings regarding multiple instances of misconduct spanning twenty-one clients. Lastly, the hearing judge made factual findings regarding witness testimony that Mr. Johnson misappropriated client funds. Regarding mitigation, the hearing judge made findings about evidence and testimony that Mr. Johnson suffered from a Gastrointestinal Stromal Tumor ("GIST tumor") when his misconduct occurred.[7]

    1.     *Mr. Johnson's failure to maintain an attorney trust account or IOLTA account until October 2015.*

When Mr. Johnson began practicing law part-time in 2013, he did not maintain an attorney trust account or IOLTA account. Mr. Johnson recognized this in a retainer agreement dated April 28, 2013, that provided:

> I am currently a part-time lawyer transitioning from the Montgomery County School System and averages very small monthly balances. Therefore the undersigned does not intend to hold monies for you or any client. Therefore all settlement check(s) will be jointly endorsed before a teller and the money deposited jointly and a check immediately issued to you (the client) "on the spot" representing your portion of the settlement as agreed by the parties. The date to be placed on your check will be determined by the client but the check must be deposited immediately, within a week but preferably sooner. All medical liens signed for by the undersigned less the person injury protection paid directly to the provider will be paid by the undersigned from any source of income available to the undersigned. **If you do not agree to this arrangement you are free at this point to hire another attorney or seek legal advice at this junction prior to signing!**

---

[7] Dr. Ashraf Meelu testified that Mr. Johnson, while operating his law practice, was suffering from a GIST tumor that affected his ability to practice law. Although the hearing judge did not opine on the effects of Mr. Johnson's medical condition in her factual findings, she did weigh the parties' testimony and evidence regarding Mr. Johnson's medical condition in her consideration of mitigating factors.

(Emphasis and exclamation point in original.) However, on February 26, 2014, and November 10, 2014, Mr. Johnson opened two Bank of America operating accounts ("Account #1945" and "Account #6070") for his law practice that were *not* attorney trust accounts or IOLTA accounts. Between April 25, 2014, and September 28, 2015, Mr. Johnson deposited $223,251 in personal injury settlement funds into Account #1945 for eighteen clients. Additionally, on April 10, 2015, Mr. Johnson deposited $11,500 in settlement funds into Account #6070 for one client. Mr. Johnson did not maintain an attorney trust account until October 5, 2015, when he opened an IOLTA attorney trust account at Bank of America.

At all relevant times between 2013 and October 5, 2015, Mr. Johnson was required to receive informed consent from his clients before depositing client funds into an account other than an attorney trust account.[8] The hearing judge found that Mr. Johnson's April 28, 2013, retainer agreement provided notice that he did not intend to hold client funds. But, in highlighting that Mr. Johnson's December 2014 retainer agreement no longer contained similar language, the hearing judge found that Mr. Johnson had ceased providing such notice.[9] Based on the language of Mr. Johnson's December 2014 retainer agreement, the hearing judge found that Mr. Johnson failed to obtain his clients' informed consent to deposit settlement funds into an operating account instead of an attorney trust account from

---

[8] *See* Rule 1.15.

[9] The hearing judge declined to make a finding that Mr. Johnson failed to obtain informed consent from clients before December 2014 because "[t]he retainer agreements for dates prior to December 2014 were not admitted into evidence."

7

December 2014 through October 2015.[10] We now turn to twenty-one client representations that primarily involve personal injury settlements arising from automobile accidents.

2.    *Representation of Chrisha Robinson.*

Ms. Chrisha Robinson testified at the evidentiary hearing that she retained Mr. Johnson to represent her in a personal injury case arising from a 2014 motor vehicle accident. During the representation, on November 23, 2015, United States Automobile Association ("USAA") issued an $8,900 settlement check made payable to Ms. Robinson and Mr. Johnson. Mr. Johnson endorsed and deposited Ms. Robinson's settlement check on December 1, 2015, without notifying her of its arrival or obtaining her endorsement.

Mr. Johnson failed to advise Ms. Robinson that he was in possession of her settlement funds until three months later on March 1, 2016. Ms. Robinson testified that she had contacted Mr. Johnson five or six times between December 1, 2015, and March 1, 2016, about the status of her settlement check. Mr. Johnson did not advise Ms. Robinson that he had received her settlement check in December 2015—instead telling her that he had not received any funds and that he was working to secure the check from USAA. After attorney's fees and costs, Mr. Johnson's trust obligation to Ms. Robinson was $5,663. Yet, when Mr. Johnson remitted Ms. Robinson's settlement funds in March 2016, he issued her a partial payment drawn on his attorney trust account for $4,508 and a settlement disbursement sheet.

---

[10] Mr. Johnson concedes that this conduct violated Rule 1.15(a).

Mr. Johnson failed to pay out his remaining $1,155 trust obligation for over a year. On or about November 21, 2017, he issued Ms. Robinson a $1,155.38 check drawn on his attorney trust account and a second settlement disbursement sheet. While Mr. Johnson met his remaining trust obligation to Ms. Robinson when he paid out the second $1,155.38 check, he misled Ms. Robinson about the origin of the funds.[11] Ms. Robinson testified that, upon arriving at Mr. Johnson's office, he explained that the check was a "refund" from a payment discrepancy between himself and Ms. Robinson's physical therapist. The hearing judge found that Mr. Johnson's bank records indicate that he did not pay, or receive a refund from, any medical provider on behalf of Ms. Robinson. The hearing judge accordingly determined that Mr. Johnson intentionally misled Ms. Robinson about the origin of the second settlement check, which was provided by Mr. Johnson in fulfillment of his outstanding trust obligation.

Throughout Mr. Johnson's representation of Ms. Robinson, his attorney trust account balance frequently dropped below his $5,663 trust obligation. On December 31, 2015, Mr. Johnson's month-end account balance for his attorney trust account was $1,900. On January 31, 2016, Mr. Johnson's attorney trust account month-end balance was $100. As a result of a $30,000 settlement in a different case, unrelated to Ms. Robinson, Mr. Johnson's February 29, 2016, month-end account balance was $20,082. However, after Mr. Johnson's first partial payment of $4,508 in March 2016, the month-end balance of his attorney trust account again dropped below his remaining $1,155 trust obligation in the

---

[11] Mr. Johnson disputes this fact. *See* infra Discussion section (A).

following months: April 2016, June 2016, December 2016, April 2017, May 2017, June 2017, July 2017, August 2017, and September 2017.[12]  Even so, Mr. Johnson withdrew his earned fee for Ms. Robinson's client matter in March 2016.  The hearing judge therefore determined that Mr. Johnson failed to maintain his trust obligation and made misrepresentations to Ms. Robinson about her settlement.

3.  *Representation of Kevin Ross.*

Mr. Johnson represented Mr. Kevin Ross on a contingency fee basis beginning on January 22, 2015.  During the representation, the Maryland Automobile Insurance Fund issued a $3,400 settlement check on November 30, 2015, made payable to Mr. Johnson and Mr. Ross.  However, on December 7, 2015, Mr. Johnson deposited Mr. Ross' settlement check into his attorney trust account without notifying Mr. Ross or obtaining his endorsement.

Mr. Johnson failed to remit Mr. Ross' settlement funds until August 15, 2016, over eight months after Mr. Johnson deposited Mr. Ross' settlement check.  On August 15, Mr. Johnson issued Mr. Ross a $3,500 check drawn on his attorney trust account.[13]

---

[12] The hearing judge's findings of fact and conclusions of law does not indicate how many times Mr. Johnson's attorney trust account balance dropped below his trust obligation to Ms. Robinson between March 1, 2017, and November 21, 2017.  The hearing judge only provided findings as to Mr. Johnson's month-end balances.

[13] Despite the parties' agreed upon contingency fee, Mr. Johnson's client file for Mr. Ross sheds light on why Mr. Johnson did not deduct his earned fee or costs from Mr. Ross' settlement.  Mr. Johnson's client file indicates that the "[c]lient needs money[,] entire check will be given to the client plus $100 extra dollars.  Client $311.65 cost will be forgiven as well."

10

Because Mr. Johnson was not holding additional funds for Mr. Ross beyond his $3,400 settlement, Mr. Johnson's $100 overpayment created a client ledger balance of negative $100. Moreover, Mr. Johnson's attorney trust account month-end balance dropped below his $3,400 obligation in the following months: December 2015, January 2016, March 2016, April 2016, and June 2016.[14]

4. *Representation of Gina Byrd.*

During Mr. Johnson's representation of Ms. Gina Byrd, the Progressive Casualty Insurance Company ("Progressive") issued a $7,500 settlement check on December 9, 2015, made payable to Mr. Johnson and Ms. Byrd. Without notifying Ms. Byrd or obtaining her endorsement, Mr. Johnson deposited Ms. Byrd's settlement check into his attorney trust account on December 15, 2015. After deducting attorney's fees and costs, Mr. Johnson's trust obligation to Ms. Byrd was $4,300. Mr. Johnson failed to remit Ms. Byrd's settlement funds until April 1, 2016, over three months after he deposited Ms. Byrd's settlement check. Yet, when Mr. Johnson paid out Ms. Byrd's settlement funds, he only issued her a partial payment of $2,500.

From December 15, 2015, to April 1, 2016, Mr. Johnson's attorney trust account month-end balance dropped below his $4,300 trust obligation in three months: December 2015, January 2016, and March 2016. During the same time period, Mr. Johnson's attorney trust account balance dropped below his trust obligation fourteen times. Mr. Johnson failed

_____

[14] The hearing judge's findings of fact and conclusions of law also did not provide how many times that Mr. Johnson's attorney trust account balance dropped below his trust obligation to Mr. Ross. The hearing judge only provided findings as to Mr. Johnson's month-end balances.

11

to pay out his remaining $1,800 trust obligation until October 5, 2017, over one year after making his first settlement payment to Ms. Byrd. The hearing judge accordingly determined that, between April 1, 2016, and October 5, 2017, Mr. Johnson's attorney trust account month-end balance dropped below his remaining $1,800 obligation.[15] In April or May 2016, Mr. Johnson earned his fee, but he failed to withdraw those funds from his attorney trust account for over four months. The hearing judge therefore found that Mr. Johnson failed to maintain his trust obligation and, by not timely removing his earned fee, commingled funds.

5.      *Representation of Clarence Weefur.*

During Mr. Johnson's representation of Mr. Clarence Weefur, the Government Employees Insurance Company ("GEICO") issued a $30,000 settlement check on February 22, 2016, made payable to Mr. Johnson and Mr. Weefur. However, before Mr. Johnson deposited the $30,000 check into his attorney trust account, $19,800 was withdrawn from his attorney trust account in connection with Mr. Weefur's client matter. This transaction created a client ledger balance of negative $19,800. Yet, on February 26, 2016, Mr. Johnson deposited Mr. Weefur's settlement check into his attorney trust account without notifying Mr. Weefur or obtaining his endorsement. After Mr. Johnson deposited the settlement check, several additional withdrawals were made in connection with Mr.

---

[15] The hearing judge did not state in which months, or how many times, Mr. Johnson's attorney trust account balance dropped below his remaining $1,800 trust obligation to Ms. Byrd.

Weefur's client matter, which caused a consistently negative client ledger balance between February 2016 and March 2018.

On August 17, 2016, six months after Mr. Johnson deposited Mr. Weefur's GEICO settlement check, the Allstate Vehicle and Property Insurance Company ("Allstate") issued a $10,957.03 settlement check made payable to Mr. Johnson and Mr. Weefur. On September 2, 2016, Mr. Johnson again deposited Mr. Weefur's settlement check into his attorney trust account without notifying Mr. Weefur or obtaining his endorsement. The hearing judge determined that Mr. Johnson's trust obligation, after attorney's fees and costs, was $20,000 to Mr. Weefur and $526.74 to the Revenue Administration Division of the Maryland Comptroller on Mr. Weefur's behalf, for a total obligation of $20,526.74. Mr. Johnson remitted $20,000 to Mr. Weefur from his attorney trust account, but he did so by making five partial payments of: $5,000 on June 10, 2016; $2,500 on July 16, 2016; $2,500 on July 31, 2016; $5,000 on September 6, 2016; and $5,000 on September 20, 2016. Over two years after depositing Mr. Weefur's first settlement check, on March 1, 2018, Mr. Johnson paid out $526.74 to the Revenue Administration Division. Between February 2016 and March 2018, the balance of Mr. Johnson's attorney trust account dropped below his trust obligation eighty-one times. The hearing judge therefore found that Mr. Johnson failed to maintain his trust obligation.

*6.  Representation of Jennifer Heaven.*

During Mr. Johnson's representation of Ms. Jennifer Heaven, USAA issued a $7,500 settlement check on March 20, 2016, made payable to Mr. Johnson and Ms. Heaven. However, on April 6, 2016, Mr. Johnson deposited Ms. Heaven's settlement

13

check into his attorney trust account without notifying her or obtaining her endorsement. After attorney's fees and costs, Mr. Johnson's trust obligation to Ms. Heaven was $4,000. Mr. Johnson failed to remit Ms. Heaven's settlement funds until June 1, 2016, almost two months after he deposited her settlement check. Between April 6, 2016, and June 1, 2016, Mr. Johnson's attorney trust account balance dropped below his $4,000 trust obligation six times. The hearing judge therefore found that Mr. Johnson failed to maintain his trust obligation.

7.      *Representation of Itati Hernandez.*

During Mr. Johnson's representation of Ms. Itati Hernandez, Erie Insurance Group ("Erie Insurance") issued a $9,000 settlement check on March 22, 2016, made payable to Mr. Johnson and Ms. Hernandez. However, on March 24, 2016, Mr. Johnson deposited Ms. Hernandez's settlement check into his attorney trust account without notifying her or obtaining her endorsement. After attorney's fees and costs, Mr. Johnson's trust obligation to Ms. Hernandez was $5,000. Mr. Johnson failed to remit Ms. Hernandez's settlement funds until August 23, 2016, almost five months after depositing Ms. Hernandez's settlement check. Between March 24, 2016, and August 23, 2016, Mr. Johnson's attorney trust account balance dropped below his $5,000 trust obligation sixteen times. Additionally, Mr. Johnson failed to remove his earned fee from his attorney trust account until August 2016. The hearing judge therefore found that Mr. Johnson failed to maintain his trust obligation and, by not timely removing his earned fee, commingled funds.

8.      *Representation of Santos Hernandez.*

14

During Mr. Johnson's representation of Mr. Santos Hernandez, Erie Insurance issued a $8,500 settlement check on March 22, 2016, made payable to Mr. Johnson and Mr. Hernandez. However, on March 28, 2016, Mr. Johnson deposited Mr. Hernandez's settlement check into his attorney trust account without notifying Mr. Hernandez or obtaining his endorsement. After attorney's fees and costs, Mr. Johnson's trust obligation to Mr. Hernandez was $4,500. Mr. Johnson failed to remit Mr. Hernandez's settlement funds until November 16, 2016, over seven months after Mr. Johnson deposited Mr. Hernandez's settlement check. Between March 28, 2016, and November 16, 2016, Mr. Johnson's attorney trust account balance fell below his $4,500 trust obligation twenty-nine times. The hearing judge therefore found that Mr. Johnson failed to maintain his trust obligation.

9.      *Representation of Louise Price.*

During Mr. Johnson's representation of Ms. Louise Price, GEICO issued a $7,250 settlement check on April 13, 2016, made payable to Mr. Johnson and Ms. Price. However, on April 18, 2016, Mr. Johnson deposited Ms. Price's settlement check into his attorney trust account without notifying her or obtaining her endorsement. After attorney's fees and costs, Mr. Johnson's trust obligation to Ms. Price was $5,250. Mr. Johnson failed to remit Ms. Price's settlement funds until August 16, 2016, over three months after depositing Ms. Price's settlement check. Between April 18, 2016, and August 16, 2016, Mr. Johnson's attorney trust account balance fell below his $5,250 trust obligation thirteen times. The hearing judge therefore found that Mr. Johnson failed to maintain his trust obligation.

10.     *Representation of Byme Taylor.*

15

During Mr. Johnson's representation of Mr. Byme Taylor, GEICO issued an $8,300 settlement check on April 27, 2016, made payable to Mr. Johnson and Mr. Taylor. However, on May 3, 2016, Mr. Johnson deposited Mr. Taylor's settlement check into his attorney trust account without notifying Mr. Taylor or obtaining his endorsement. Mr. Johnson failed to remit Mr. Taylor's settlement funds until January 10, 2017, over eight months after depositing Mr. Taylor's settlement check.

Mr. Johnson issued a $2,500 payment drawn on his attorney trust account to "Whosoever Will Christian Church" on Mr. Taylor's behalf. However, Mr. Johnson deducted as attorney's fees a majority of Mr. Taylor's settlement funds, earned by providing legal work on unrelated matters. When Mr. Johnson made the payment, he was only holding $100 of Mr. Taylor's funds in trust and the payment caused a client ledger balance of negative $2,400. Between April 27, 2016, and January 10, 2017, Mr. Johnson's attorney trust account balance fell below his trust obligation nineteen times. The hearing judge therefore found that Mr. Johnson failed to maintain his trust obligation to Mr. Taylor.

11.     *Representation of Ajamu and Shelly Patterson.*

During Mr. Johnson's representation of Mr. Ajamu Patterson and Ms. Shelly Patterson, Progressive issued two separate $7,100 settlement checks on May 23, 2016. Mr. Patterson's check was made payable to himself and Mr. Johnson, while Ms. Patterson's check was made payable to herself and Mr. Johnson. Two days later, on May 25, 2016, Mr. Johnson deposited both checks into his attorney trust account without notifying the Pattersons or obtaining either clients' endorsement. Mr. Johnson's trust obligation was

16

$7,900 to the Pattersons collectively, and $1,280 to Wilkins Chiropractic Center, which was one of the Pattersons' medical providers.

Mr. Johnson did not remit Ms. Patterson's settlement funds until July 20, 2016, and Mr. Patterson's funds until July 28, 2016. Mr. Johnson waited over one year before remitting the funds due to Wilkins Chiropractic Center on August 25, 2017. Between May 25, 2016, and July 28, 2016, when Mr. Johnson paid out the Pattersons' settlement funds, Mr. Johnson's attorney trust account dropped below his $7,900 trust obligation nine times. From May 25, 2016, until August 25, 2017, when Mr. Johnson paid out Wilkins Chiropractic Center, his attorney trust account balance fell below his remaining $1,280 trust obligation twenty-five times. The hearing judge therefore found that Mr. Johnson failed to maintain his trust obligation to the Pattersons and Wilkins Chiropractic Center.

12.    *Representation of Teressa Fultz.*

During Mr. Johnson's representation of Ms. Teressa Fultz, GEICO issued a $7,736 settlement check on June 3, 2016, made payable to Mr. Johnson and Ms. Fultz. However, on June 10, 2016, Mr. Johnson deposited Ms. Fultz's settlement check into his attorney trust account without notifying her or obtaining her endorsement. After attorney's fees and costs, Mr. Johnson's trust obligation to Ms. Fultz was $5,736. Mr. Johnson failed to remit Ms. Fultz's settlement funds until August 16, 2016, and allowed his attorney trust account balance to fall below his $5,736 trust obligation nine times. The hearing judge therefore found that Mr. Johnson failed to maintain his trust obligation.

13.    *Representation of Chardae Bell.*

17

During Mr. Johnson's representation of Ms. Chardae Bell, the State Farm Mutual Insurance Company ("State Farm") issued an $8,500 settlement check on August 4, 2016, made payable to Mr. Johnson and Ms. Bell. However, on August 9, 2016, Mr. Johnson deposited Ms. Bell's settlement check into his attorney trust account without notifying her or obtaining her endorsement. After attorney's fees and costs, Mr. Johnson's trust obligation to Ms. Bell was $5,243.12. Mr. Johnson failed to remit Ms. Bell's settlement funds until August 15, 2017, over one year after he deposited Ms. Bell's settlement check. Between August 9, 2016, and August 15, 2017, Mr. Johnson's trust account fell below his $5,243.12 trust obligation fifty-eight times. The hearing judge therefore determined that Mr. Johnson failed to maintain his trust obligation.

14. *Representation of Victoria McCollum.*

During Mr. Johnson's representation of Ms. Victoria McCollum, State Farm issued a $6,000 settlement check on August 4, 2016, made payable to Mr. Johnson and Ms. McCollum. On August 9, 2016, Mr. Johnson deposited Ms. McCollum's settlement check into his attorney trust account without notifying her or obtaining her endorsement. After attorney's fees and costs, Mr. Johnson's trust obligation to Ms. McCollum was $4,000. Mr. Johnson failed to remit Ms. McCollum's settlement funds until November 4, 2016, over two months after depositing her settlement check. Between August 9, 2016, and November 4, 2016, Mr. Johnson's attorney trust account balance fell below his $4,000 trust obligation nine times. The hearing judge therefore found that Mr. Johnson failed to maintain his trust obligation.

15. *Representation of India Gooden.*

18

Ms. India Gooden testified at the evidentiary hearing that she retained Mr. Johnson in 2016 to represent her in a personal injury case resulting from an automobile accident.[16] During the representation, State Farm issued a $6,200 settlement check on August 4, 2016, made payable to Mr. Johnson and Ms. Gooden. However, Mr. Johnson deposited Ms. Gooden's settlement check into his attorney trust account on August 9, 2016, without notifying her or obtaining her endorsement.

After attorney's fees and costs, Mr. Johnson's trust obligation to Ms. Gooden was $3,727.62. Mr. Johnson failed to remit Ms. Gooden's settlement proceeds until January 13, 2017, over five months after depositing Ms. Gooden's settlement check. However, when Mr. Johnson paid Ms. Gooden, he issued her a $2,000 partial payment drawn from Account #1945—an operating account that is not an attorney trust account. Ms. Gooden testified that, between August 9, 2016, and January 13, 2017, when Mr. Johnson issued the $2,000 check, Mr. Johnson did not inform her that he had received her settlement funds. Instead, Ms. Gooden testified that she had asked about the status of her settlement funds five or six times and that Mr. Johnson maintained he was waiting for State Farm to issue the check. The hearing judge accordingly found that Mr. Johnson misrepresented the amount of settlement proceeds that Ms. Gooden was entitled to receive on January 13, 2017.

The hearing judge also found that Mr. Johnson misrepresented the origin of a second payment made to Ms. Gooden in August 2017, after he advised her that State Farm had

---

[16] Ms. McCollum and Ms. Bell—also clients of Mr. Johnson—were passengers in Ms. Gooden's vehicle when the accident occurred. *See* supra Background sections B(13), (14).

paid out additional funds. On or around August 15, 2017, Ms. Gooden visited Mr. Johnson's office to receive her additional funds, but Mr. Johnson refused to issue the funds unless she signed and notarized an affidavit stating: "I, India Gooden, hereby affirmed [sic] under penalty of perjury that Mr. Johnson kept me updated and obtained approval about the entire case throughout 2016 and 2017." Mr. Johnson accompanied Ms. Gooden to a notary public to have her sign the affidavit, and upon returning to Mr. Johnson's office, he issued her a $3,727.62 check drawn on his attorney trust account.

However, after receiving Ms. Gooden's affidavit and issuing her the $3,727.62 check, Mr. Johnson requested that she deposit the check and return $2,000 in cash to him. Mr. Johnson presented Ms. Gooden with a settlement disbursement sheet to sign that did not mention the $2,000 payment made on January 13, 2017, or Mr. Johnson's request that she return $2,000 in cash to him. Ms. Gooden ultimately signed the settlement disbursement sheet but, after Mr. Johnson refused to provide additional documentation about his previous $2,000 payment to her, the parties got into a verbal altercation and a third-party called the police. Ms. Gooden left Mr. Johnson's office with the $3,727.62 check and deposited it on August 16, 2017, without returning $2,000 in cash to Mr. Johnson. Based on Mr. Johnson's August 2017 encounter with Ms. Gooden, the hearing judge again found that he had made intentional misrepresentations to Ms. Gooden when he misled her about the origin of the $3,727.62 check.

At the evidentiary hearing, Mr. Johnson testified that his nephew and non-attorney employee—Romeo Clarke—misappropriated Ms. Gooden's settlement funds in the process of stealing client funds from Mr. Johnson. Mr. Johnson first explained that Mr.

20

Clarke stole funds by depositing client settlement checks into Mr. Johnson's attorney trust account without Mr. Johnson's or the client's knowledge. According to Mr. Johnson, Mr. Clarke then transferred client funds from Mr. Johnson's attorney trust account to Account #6070 and used a debit card associated with that account to steal funds.

Mr. Johnson also testified about the circumstances surrounding Ms. Gooden's $2,000 settlement payment on January 13, 2017. Mr. Johnson maintained that Mr. Clarke was in a relationship with Ms. Gooden and used one of two blank checks left in the office by Mr. Johnson for emergency purposes to pay her without Mr. Johnson's knowledge. Even so, the hearing judge declined to make a finding that the $2,000 check issued to Ms. Gooden from Account #1945 was a blank check that was left in Mr. Johnson's office for emergency purposes and issued by Mr. Clarke. The hearing judge therefore declined to make a finding that Mr. Clarke misappropriated Ms. Gooden's settlement funds and that Mr. Clarke made the $2,000 payment to Ms. Gooden using a blank check left in Mr. Johnson's office for emergency purposes.

16. *Representation of Emmett and Nyan Acquoi.*

During Mr. Johnson's representation of Mr. Emmett Acquoi and Ms. Nyan Acquoi, Allstate issued two separate $4,300 settlement checks on September 15, 2016. Mr. Acquoi's check was made payable to himself and Mr. Johnson, while Ms. Acquoi's check was made payable to herself and Mr. Johnson. Mr. Johnson deposited both settlement checks into his attorney trust account on September 29, 2016, without notifying the Acquois or obtaining either clients' endorsement. After attorney's fees and costs, Mr. Johnson's total trust obligation to the Acquois was $4,200. Mr. Johnson did not remit the

Acquois' settlement funds until October 14, 2016, and the hearing judge determined that he did so using settlement proceeds received in connection with other client matters. Between September 29, 2016, and October 14, 2016, the balance of Mr. Johnson's attorney trust account was $900.03. Therefore, the hearing judge also determined that Mr. Johnson failed to maintain his trust obligation.

17. *Representation of Gustavo Sandoval.*

During Mr. Johnson's representation of Mr. Gustavo Sandoval, Erie Insurance issued a $3,000 settlement check on September 29, 2016, made payable to Mr. Sandoval and Mr. Johnson. Mr. Johnson endorsed and deposited Mr. Sandoval's settlement check on October 4, 2016, without notifying Mr. Sandoval or obtaining his endorsement. After attorney's fees and costs, Mr. Johnson's trust obligation to Mr. Sandoval was $1,857.41. Mr. Johnson failed to remit Mr. Sandoval's settlement funds until August 25, 2017, more than ten months after Mr. Johnson deposited Mr. Sandoval's settlement check. Between October 4, 2016, and August 25, 2017, Mr. Johnson's attorney trust account balance dropped below his trust obligation twenty-five times. The hearing judge therefore determined that Mr. Johnson failed to maintain his trust obligation.

18. *Representation of Aloysius Glover.*

During Mr. Johnson's representation of Mr. Aloysius Glover, USAA issued a $12,000 settlement check on October 19, 2016, made payable to Mr. Glover and Mr. Johnson. Without notifying Mr. Glover or receiving his endorsement, Mr. Johnson

22

deposited Mr. Glover's settlement check into his attorney trust account.[17]   After attorney's

fees and costs, Mr. Johnson's trust obligation to Mr. Glover was $6,887.  Mr. Johnson did

not remit Mr. Glover's settlement funds until August 15, 2017, over nine months after Mr.

Glover's settlement check was issued by USAA.  Between October 28, 2016, and August

15, 2017, Mr. Johnson's attorney trust account balance fell below his trust obligation fifty

times.  The hearing judge therefore found that Mr. Johnson failed to maintain his trust

obligation.

     *19.     Representation of Kelly Frosolone.*

During Mr. Johnson's representation of Ms. Kelly Frosolone, Progressive issued

three separate settlement checks on April 5, 2017, totaling $10,000, for Ms. Frosolone and

her two minor children.[18]   Mr. Johnson deposited all three settlement checks into his

attorney trust account on April 13, 2017, without notifying Ms. Frosolone or obtaining her

endorsement.  Ms. Frosolone's $8,500 check was returned by Bank of America because of

an ineffective endorsement on April 18, 2017.  Progressive re-issued the $8,500 check on

April 25, 2017, and, on May 1, 2017, Mr. Johnson again deposited the check into his

attorney trust account without obtaining Ms. Frosolone's endorsement.

After attorney's fees and costs, Mr. Johnson's trust obligation to Ms. Frosolone and

her children was $5,200.  Mr. Johnson failed to remit Ms. Frosolone's settlement funds

---

[17] The record indicates that Mr. Johnson deposited Mr. Glover's settlement check into his attorney trust account on October 28, 2016.

[18] Ms. Frosolone's settlement check was for $8,500 and her children's checks were for $1,000 and $500 respectively.

until July 7, 2017, around three months after he received the three settlement checks. The hearing judge found that, between April 13, 2017, and July 7, 2017, Mr. Johnson's attorney trust account balance dropped below his $5,200 obligation eight times. Moreover, the hearing judge found that Mr. Johnson withdrew $800 in "miscellaneous cost[s]" pertaining to Ms. Frosolone's client matter and failed to remove those funds until July 7, 2017. The hearing judge therefore determined that Mr. Johnson failed to maintain his trust obligation and, by failing to remove costs associated with Ms. Frosolone's client matter for three months, commingled funds.

20. *Representation of Edward Feustel.*

During Mr. Johnson's representation of Mr. Edward Feustel, Progressive issued a $6,000 settlement check on June 28, 2017, made payable to Mr. Johnson and Mr. Feustel. Mr. Johnson endorsed and deposited Mr. Feustel's settlement check into his attorney trust account on July 3, 2017, without notifying Mr. Feustel or obtaining his endorsement. Mr. Johnson testified at the evidentiary hearing that $4,000 of Mr. Feustel's settlement funds belonged to him in repayment of a loan that he previously made to Mr. Feustel. Although $4,000 of Mr. Feustel's settlement funds belonged to Mr. Johnson, he deposited all of Mr. Feustel's settlement funds into his attorney trust account. Mr. Johnson testified that he deposited Mr. Feustel's settlement check because he wanted to bring his attorney trust account into balance, however Mr. Johnson subsequently used these funds to pay out other clients. The hearing judge therefore found that, by depositing Mr. Feustel's funds into his attorney trust account and using those funds to pay out other clients, Mr. Johnson commingled funds.

24

In November 2017, Mr. Johnson and Mr. Feustel renegotiated the terms of their outstanding loan and Mr. Johnson issued Mr. Feustel a $2,590 settlement check. Later, Mr. Feustel made four $1,000 payments to repay Mr. Johnson for the outstanding loan. The hearing judge also found that, as of July 3, 2017, Mr. Johnson had a $910 trust obligation to Adolph & Kalkstein Chiropractic. Mr. Johnson failed to remit those funds until November 18, 2017, over four months after depositing Mr. Feustel's settlement check. Throughout Mr. Johnson's representation of Mr. Feustel, the hearing judge found that Mr. Johnson failed to manage his trust account, failed to provide competent representation, and failed to promptly remit funds to Mr. Feustel and Adolph & Kalkstein Chiropractic.

21. *Testimony Regarding Mr. Johnson's Alleged Misappropriation of Funds.*

Finally, the hearing judge made factual findings about the parties' testimony concerning the misappropriation of client funds from Mr. Johnson's attorney trust account. Bar Counsel presented testimony from Ms. Robinson, Ms. Gooden, and Charles Miller, a Forensic Investigator and Certified Public Accountant for the Attorney Grievance Commission.[19] Mr. Johnson, on the other hand, presented testimony from Jeffery Barsky and Robert Waller, both of whom are Certified Public Accountants who were accepted by the hearing judge as experts in accounting, forensic accounting, and fraud examination. Mr. Johnson also presented testimony from Dr. Ashraf Meelu, a medical doctor who was

---

[19] Mr. Miller was not presented as an expert witness, and his testimony generally concerned client transaction summaries based on Mr. Johnson's Bank of America account documents, client ledgers, and client files.

accepted by the hearing judge as an expert witness in oncology. Additionally, Mr. Johnson, and his wife, Ms. Andrea Johnson, testified at the evidentiary hearing.

Based on Mr. Waller's and Mr. Barsky's testimony, the hearing judge first declined to make a finding that Mr. Johnson's attorney trust account would have been in balance but for Mr. Clarke's alleged transfer of funds associated with Mr. Weefur's client matter. Mr. Johnson conceded that funds were misappropriated from his attorney trust account in connection with Mr. Weefur's client matter. However, Mr. Johnson's expert witness testimony shifted the blame entirely to Mr. Clarke and sought to discredit Mr. Miller's testimony and client transaction summaries.

Mr. Johnson's expert witnesses testified that Mr. Johnson failed to maintain his client trust obligations because Mr. Clarke—acting alone and with the intent to steal client funds from Mr. Johnson—transferred $73,945.17 in fees and expenses from Mr. Johnson's attorney trust account. According to Mr. Johnson's expert witnesses, Mr. Clarke's alleged transfers were only associated with Mr. Weefur's client matter. Furthermore, Mr. Johnson's expert witnesses testified that Mr. Clarke stole $57,456.56 by transferring client funds from Mr. Johnson's attorney trust account to Account #6070 and using a debit card associated with that account to make purchases and withdrawals. Mr. Johnson's expert witnesses therefore concluded that, but for Mr. Clarke's alleged actions, Mr. Johnson's attorney trust account would not have been out of balance at any point in time.[20]

---

[20] Mr. Johnson's expert witnesses also highlighted the remedial actions taken by Mr. Johnson after discovering the transfers, concluding that all of Mr. Johnson's clients were paid in full and that Mr. Johnson's attorney trust account remained in balance from October 2017 through March 2018.

Because Mr. Johnson maintained that his attorney trust account imbalances stemmed from transfers made in connection with Mr. Weefur's client matter, Mr. Barsky also testified about Mr. Johnson's specific trust obligations during Mr. Weefur's representation. Mr. Johnson represented Mr. Weefur on a contingency fee basis regarding his insurance settlements. At the same time, Mr. Barsky testified that Mr. Johnson also agreed to negotiate Mr. Weefur's medical debts on his behalf after those costs exceeded his insurance settlement proceeds. Mr. Johnson charged $350 per hour for this work and Mr. Barsky testified that, by the time Mr. Johnson deposited Mr. Weefur's $30,000 GEICO settlement check into his attorney trust account, Mr. Johnson's contingency fee and earned hourly fee had exceeded $30,000.

However, Mr. Johnson's testimony did not confirm whom Mr. Weefur's $30,000 settlement check belonged to at the time Mr. Johnson deposited it into his attorney trust account or whether his ledger for Mr. Weefur's client matter was accurate. Contrary to Mr. Barsky's testimony that Mr. Johnson had earned Mr. Weefur's settlement funds, Mr. Johnson remitted $20,000 from his attorney trust account, and $4,000 from his operating account, to Mr. Weefur. The hearing judge therefore found that, because Mr. Johnson did not sufficiently explain his accounting in Mr. Weefur's client matter, or verify the information that Mr. Barsky's expert testimony relied on, she could not make a finding that

27

Mr. Johnson's attorney trust account would have been in balance but for the transfers associated with Mr. Weefur's client matter.[21]

The hearing judge also declined to credit Mr. Waller's testimony about Mr. Clarke's alleged theft or make a finding that Mr. Miller's testimony and summaries were unreliable. Mr. Waller testified about Mr. Clarke's alleged theft of funds associated with Mr. Weefur's client matter, and Mr. Johnson requested that the hearing judge credit Mr. Waller's testimony based on his qualifications, use of corroborating documentary evidence, adherence to industry-standard methodology, and thorough analysis of Mr. Johnson's client documents. Mr. Johnson also requested that the hearing judge discredit Mr. Miller's summaries and testimony as unreliable because Mr. Miller did not conduct a theft or shortfall analysis, did not review pertinent documents, and failed to interview witnesses.[22] The hearing judge declined to make these findings regarding Mr. Waller's and Mr. Miller's testimony.

Next, the hearing judge determined that, although she declined to make a finding that Mr. Johnson participated in the misappropriation of funds, she did not find credible

---

[21] The hearing judge also highlighted that an addendum contract modifying Mr. Johnson's original retainer agreement with Mr. Weefur was not signed until February 2016, two months after withdrawals started being made from Mr. Johnson's attorney trust account that matched with his hourly rate.

[22] Mr. Johnson's expert witnesses also testified that Mr. Miller's calculations concerning Mr. Johnson's attorney trust account were incorrect and that Bar Counsel's accounting evidence did not conform with AICPA methodology, Generally Accepted Accounting Principles ("GAAP"), or AICPA's Statement of Financial Concepts Number 2, paragraph 160.

28

Mr. Johnson's testimony that he was unaware of the misappropriation. Mr. Johnson testified that he personally settled his clients' personal injury cases and knew when to expect each settlement check. Moreover, Mr. Johnson endorsed several client settlement checks, and in Ms. Robinson's and Ms. Gooden's client matters, Mr. Johnson made affirmative misrepresentations about the arrival of their settlement checks. Based on Mr. Johnson's actions and his testimony at the evidentiary hearing, the hearing judge declined to make a finding that Mr. Johnson was unaware of the misappropriation of funds from his attorney trust account.

Lastly, despite Mr. Waller's and Mr. Barsky's testimony that Mr. Clarke's theft caused Mr. Johnson's attorney trust account to remain out of balance, the hearing judge discredited Mr. Johnson's testimony that both he and his wife were unaware of Mr. Clarke's unauthorized withdrawals from Account #6070. Mr. and Ms. Johnson both had access to the debit card associated with Account #6070, which Mr. Clarke allegedly used to steal funds, and Ms. Johnson testified that she had created journals to determine who made purchases and cash withdrawals from the account. Moreover, by Mr. Johnson's own admission and Mr. Barsky's schedule of expenditures for Account #6070, Mr. Johnson spent $127,978.22 from Account #6070 between December 2015 and October 2016. Because Mr. and Ms. Johnson had control over Account #6070, used the debit card associated with the account, and maintained journals to track withdrawals from the account, the hearing judge declined to make a finding that Mr. Johnson was unaware of Mr. Clarke's unauthorized transactions. However, because Mr. Johnson, Ms. Johnson, and Mr. Clarke all had access to the debit card associated with Account #6070, the hearing

29

judge also declined to make a finding as to which person made the unauthorized transactions.

## STANDARD OF REVIEW

In an attorney discipline proceeding, this Court reviews for clear error a hearing judge's findings of fact, and reviews without deference a hearing judge's conclusions of law. *See* Md. Rule 19-741(b)(2)(B) ("The Court [of Appeals] shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses."); *Attorney Grievance Comm'n v. Smith-Scott*, 469 Md. 281, 332 (2020) (citation omitted) ("[T]his Court reviews for clear error a hearing judge's findings of fact . . . ."); Md. Rule 19-741(b)(1) ("The Court of Appeals shall review de novo the [hearing] judge's conclusions of law."). This Court determines whether clear and convincing evidence establishes that a lawyer violated a rule of professional conduct. *See* Md. Rule 19-727(c) ("Bar Counsel has the burden of proving the averments of the petition [for disciplinary or remedial action] by clear and convincing evidence.").

Either party may file "exceptions to the findings and conclusions of the hearing judge[.]" Md. Rule 19-728(b). If a party excepts to the hearing judge's findings, this Court "shall determine whether the findings of fact have been proved by the requisite standard of proof set out in Rule 19-727(c)." Md. Rule 19-741(b)(2)(B). "We may confine our review to the findings of fact challenged by the exceptions, mindful though, that the hearing judge is afforded due regard to assess the credibility of witnesses." *Smith-Scott*, 469 Md. at 332 (citation omitted). This Court will not disturb the hearing judge's findings "where 'there is any competent evidence to support the' finding of fact." *Id.* (quoting *Attorney Grievance*

30

*Comm'n v. Donnelly*, 458 Md. 237, 276 (2018)). Therefore, "[i]f the hearing judge's factual findings are not clearly erroneous and the conclusions drawn from them are supported by the facts found, exceptions to conclusions of law will be overruled." *Id.* at 333 (quoting *Attorney Grievance Comm'n v. Tanko*, 408 Md. 404, 419 (2009)).

**DISCUSSION**

Bar Counsel does not except to any of the hearing judge's findings of fact or conclusions of law. Mr. Johnson notes several exceptions to both the hearing judge's findings of fact and conclusions of law. We shall address each in turn.

**A.** ***Exceptions to the Hearing Judge's Findings of Fact.***

Mr. Johnson takes exception to five of the hearing judge's factual findings: (1) that Mr. Johnson was not suffering from the effects of his GIST tumor when client funds were misappropriated from his attorney trust account; (2) that Mr. Miller's testimony and summaries were admissible; (3) that Mr. Johnson made misrepresentations to Ms. Robinson; (4) that Mr. Johnson did not pay out $2,500 in settlement proceeds to Mr. Taylor; and (5) that Mr. Johnson made misrepresentations to Ms. Gooden.

A hearing judge is given "a great deal of discretion in determining which evidence to rely upon." *Attorney Grievance Comm'n v. Miller*, 467 Md. 176, 195 (2020) (citing *Attorney Grievance Comm'n v. Woolery*, 462 Md. 209, 230 (2018)). Therefore, this Court "generally 'defer[s] to the credibility findings of the hearing judge.'" *Attorney Grievance Comm'n v. Hodes*, 441 Md. 136, 181 (2014) (quoting *Attorney Grievance Comm'n v. Agbaje*, 438 Md. 695, 722 (2014)). We do so because "[t]he hearing judge is in the best position to evaluate the credibility of the witnesses and to decide which one to believe and,

31

as we have said, to pick and choose which evidence to rely upon." *Id.* (internal quotation marks omitted) (quoting *Attorney Grievance Comm'n v. DiCicco*, 369 Md. 662, 683–84 (2002)); *see also Woolery*, 462 Md. at 230 (2018) (internal quotation marks and citation omitted) ("As far as what evidence a hearing judge must rely upon to reach his or her conclusions, we have said that the hearing judge may pick and choose what evidence to believe.").

Mr. Johnson first excepts to the hearing judge's determination that he was not suffering from symptoms of his GIST tumor when client funds were misappropriated from his attorney trust account. However, the hearing judge was in the best position to determine the credibility of the witnesses presented at the evidentiary hearing when she found that Mr. Johnson "did not introduce any credible evidence establishing that he was experiencing any symptoms [of his GIST tumor]" between 2015 and 2017—when the misappropriation occurred. Although Dr. Meelu testified about the effects of Mr. Johnson's GIST tumor dating back to 2015, the hearing judge determined that Mr. Johnson was not entitled to mitigation as a result of his diagnosis because he "never saw a specialist, was never hospitalized, and did not receive any blood transfusions" during this timeframe. Mr. Johnson's arguments that the hearing judge incorrectly focused on acute anemia, rather than chronic anemia, and ignored Dr. Meelu's testimony regarding Mr. Johnson's anemia both fail. The hearing judge made no mention of "acute" anemia in her findings of fact or conclusions of law and credited Dr. Meelu's testimony on cross-examination that Mr. Johnson "was not suffering from anemia as late as June 2016."

32

Therefore, the credibility determination made by the hearing judge—after considering the evidence and testimony from Dr. Meelu and Mr. Johnson—is one that this Court defers to absent clear error. Md. Rule 19-741(b)(2)(B) ("Th[is] Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses."). We find no clear error. "[T]he hearing judge was in the best position to evaluate the veracity of [Mr. Johnson's] explanation regarding [his] alleged violation[s] of the [Rules]" when she found that Mr. Johnson "failed to prove by a preponderance of the evidence that he was suffering from a physical disability at the time of the misconduct." *Miller*, 467 Md. at 195 (internal quotation marks omitted) (quoting *Attorney Grievance Comm'n v. Kepple*, 432 Md. 214, 226–27 (2013)). We therefore overrule Mr. Johnson's exception.

Next, Mr. Johnson excepts to the hearing judge's decision to credit Mr. Miller's summaries as reliable and contends that Mr. Miller should have been prohibited from introducing them at the evidentiary hearing. Mr. Johnson primarily contends that Mr. Miller should not have been permitted to testify about his summaries at the evidentiary hearing because he was not designated as an expert witness, his summaries included expert analysis, and his summaries were not timely disclosed. However, this Court addressed similar summaries presented by Mr. Miller in *Attorney Grievance Comm'n v. Sanderson*, 465 Md. 1, 37–38 (2019). In *Sanderson*, this Court overruled Garland Sanderson's exception to Mr. Miller's testimony because:

> The activities which Mr. Miller engaged in do not require any particular expertise in a subject-matter. Mr. Miller, in his role as investigator, reviewed the bank records obtained from Wells Fargo and placed some of this information, concerning Mr. Sanderson's trust account, in tables detailing the transactions. In this regard, Mr. Miller acted as a fact witness and merely

33

noted data from the financial records and recorded this information in tables for greater ease of access. In his review, Mr. Miller offered no expertise, merely reiterated numbers from the records, and the subject-matter did not require a particular level of expertise. Accordingly, Mr. Miller testified as a fact witness instead of an expert witness[.]

*Sanderson*, 465 Md. at 38.

We also find that Mr. Miller's testimony here, which relied on summaries created from Mr. Johnson's Bank of America records, client ledgers, and subpoenaed documents, was within the ken of a layperson witness. *See id.* at 37–38 (citing *Dorsey v. Nold*, 362 Md. 241, 257 (2001)) ("[W]e have held that individuals testify as expert witnesses where they opine in a particular matter on subjects which laypersons would typically be unable to grasp."). Mr. Miller's summaries here do not require any particular expertise in a subject matter and, contrary to Mr. Johnson's contentions, Mr. Miller testified as a fact witness.[23] We therefore overrule Mr. Johnson's exception.

Mr. Johnson also excepts to various findings concerning his representation of Ms. Robinson, Mr. Taylor, and Ms. Gooden. Mr. Johnson first asks this Court to find erroneous the hearing judge's determination that Mr. Johnson made misrepresentations to Ms. Robinson about her settlement. We decline to do so. Mr. Johnson contends that the hearing judge erred in stating that the "bank records admitted in evidence do not demonstrate that [Mr. Johnson] paid any medical provider on behalf of Ms. Robinson or that he received a refund check from any provider[.]" Mr. Johnson accordingly asks the Court to determine that he did not make misrepresentations to Ms. Robinson or misappropriate her funds. But

---

[23] We also disagree that Mr. Miller's summaries were not timely disclosed.

34

the evidence presented at the hearing supports the hearing judge's factual finding that Mr. Johnson made misrepresentations to Ms. Robinson about the status of her settlement funds.[24]

Significantly, Mr. Johnson still made misrepresentations to Ms. Robinson when he told her that he was not in possession of her settlement funds between December 2015 and March 2016, and that his $1,115.38 payment to her was a "refund" from a payment discrepancy with her chiropractor. Even if the hearing judge erred in finding that Mr. Johnson did not make a payment or payments to Ms. Robinson's chiropractor—and we believe the hearing judge did not err based on the evidence presented at trial—there is no evidence that the $1,115.38 paid out to Ms. Robinson was returned to Mr. Johnson by the chiropractor as a "refund."[25] The hearing judge did not clearly err in finding that Mr. Johnson made misrepresentations to Ms. Robinson about her settlement. We therefore overrule Mr. Johnson's exception.

Furthermore, Mr. Johnson excepts to the hearing judge's findings concerning Mr. Taylor's settlement payment. We agree that the hearing judge's findings of fact and

---

[24] Mr. Johnson filed a Motion for Leave to Remand in this Court so that the hearing judge could consider newfound evidence purporting to show that Mr. Johnson did make a payment to Ms. Robinson's chiropractor. We denied Mr. Johnson's motion and we decline to consider newfound evidence brought to this Court's attention *months* after the conclusion of the evidentiary hearing.

[25] In addition to Ms. Robinson's testimony about Mr. Johnson's $1,115.38 payment, the record indicates that the memo line of the check issued to Ms. Robinson was filled out "Refund." It is also worth noting that Mr. Johnson's second payment of $1,115.38 on November 21, 2017, paid out $.38 more than the exact $1,155 balance of Mr. Johnson's remaining trust obligation to Ms. Robinson.

conclusions of law may suggest that Mr. Johnson misappropriated $2,500 in settlement funds from Mr. Taylor. While Mr. Johnson did create a client ledger imbalance by making a $2,500 payment to "Whosoever Will Christian Church" on Mr. Taylor's behalf, it does not automatically follow that Mr. Johnson misappropriated those funds. To the extent that the hearing judge's findings concerning Mr. Taylor's representation suggest that Mr. Johnson failed to pay out his trust obligation, we sustain Mr. Johnson's exception.

Lastly, Mr. Johnson excepts to the hearing judge's finding that Mr. Johnson made misrepresentations to Ms. Gooden about her settlement. Mr. Johnson is correct in asserting that his two payments to Ms. Gooden totaled $5,727.62, which exceeded her share of the settlement. Mr. Johnson also is correct that Bar Counsel did not meet its burden of proving that he made misrepresentations regarding the $2,000 check that was paid to Ms. Gooden on January 13, 2017.[26] However, these have no bearing on other misrepresentations that Mr. Johnson made during Ms. Gooden's representation. Like in Ms. Robinson's representation, Mr. Johnson made affirmative misrepresentations to Ms. Gooden that her settlement check had not been issued after he had already deposited the check. Moreover, Mr. Johnson misrepresented to Ms. Gooden that State Farm had issued additional settlement funds and that she was required to sign an affidavit to receive those funds.

---

[26] The hearing judge discredited Mr. Johnson's testimony "that the January 13, 2017[,] check issued to Ms. Gooden was a blank check that had been left for Mr. Clarke's emergency purposes and improperly issued to Mr. Gooden by Mr. Clarke." However, Bar Counsel did not prove by clear and convincing evidence, nor does the record support, that Mr. Johnson knew that this check was issued to Ms. Gooden on January 13, 2017.

We therefore sustain Mr. Johnson's exception to the hearing judge's finding that he made misrepresentations in connection with the $2,000 check that was issued to Ms. Gooden. Otherwise, however, the record supports the hearing judge's finding by clear and convincing evidence that Mr. Johnson made misrepresentations to Ms. Gooden during her representation. We therefore overrule Mr. Johnson's general exception that Mr. Johnson did not make misrepresentations to Ms. Gooden.

## B. Conclusions of Law.

The hearing judge concluded that Mr. Johnson violated Rules 1.1, 1.4, 1.15, 5.3, and 8.4. The hearing judge also concluded that Mr. Johnson violated Maryland Rules 16-603, 16-604, 19-408, and 19-410. Bar Counsel does not except to any of the hearing judge's conclusions of law. Mr. Johnson excepts to the hearing judge's conclusions that he violated Rules 1.15(a), and 5.3(c). Based on an independent review of the record, we sustain Mr. Johnson's exception as to Rule 5.3(c) and uphold the hearing judge's remaining conclusions of law.

### 1. Rule 1.1 (Competence).

Rule 1.1 requires that an attorney "provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." "[A]n attorney 'demonstrates incompetence, and therefore violates Rule [1.1], when he [or she] fails to properly maintain his [or her] client trust account.'" *Attorney Grievance Comm'n v. Frank*, 470 Md. 699, 735 (2020) (some alteration in original) (quoting *Attorney Grievance Comm'n v. Smith*, 457 Md. 159, 214 (2018)). Additionally, an attorney's "failure to maintain [client] funds

in a proper trust account demonstrates incompetence." *Smith-Scott*, 469 Md. at 337 (quoting *Attorney Grievance Comm'n v. Maignan*, 390 Md. 287, 296–97 (2005)).

The hearing judge concluded that Mr. Johnson violated Rule 1.1 by failing to promptly remit settlement funds due to clients and by making misrepresentations to Ms. Robinson and Ms. Gooden about the status of their settlement checks. As evidenced by the hearing judge's factual findings, Mr. Johnson failed to maintain client funds in an attorney trust account and, after opening an attorney trust account, exhibited an extensive pattern of mishandling client funds held in trust. Mr. Johnson does not except to these conclusions of law. Based on our independent review of the record, we agree that Mr. Johnson violated Rule 1.1 by failing to promptly remit funds due to clients, by making misrepresentations to clients about their settlements, and by exhibiting an extensive pattern of improperly handling client funds.

2. *Rule 1.4 (Communication).*

Rule 1.4 provides:

(a) An attorney shall:

> (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 19-301.0 (f) (1.0), is required by these Rules;
> (2) keep the client reasonably informed about the status of the matter;
> (3) promptly comply with reasonable requests for information; and
> (4) consult with the client about any relevant limitation on the attorney's conduct when the attorney knows that the client expects assistance not permitted by the Maryland Attorneys' Rules of Professional Conduct or other law.

(b) An attorney shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Under Rule 1.4, attorneys are required "to communicate with their clients and keep them reasonably informed of the status of their legal matters." *Attorney Grievance Comm'n v. Planta*, 467 Md. 319, 349 (2020). Accordingly, an attorney's failure to disburse funds due to clients and third-parties in a timely manner constitutes "a failure to keep [their] clients reasonably informed about the status of their cases in violation of Rule 1.4." *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 369 (2005).

The hearing judge concluded that Mr. Johnson violated Rule 1.4(a)(2) and (b) when he failed to keep Ms. Robinson reasonably informed about her case "to the extent reasonably necessary to permit [her] to make informed decisions regarding the representation." After depositing Ms. Robinson's settlement check, Mr. Johnson misrepresented to her that he was still waiting for the check to arrive. Again, in November 2017, Mr. Johnson misled Ms. Robinson by telling her that a second $1,155.38 settlement payment was a refund from a payment discrepancy between Mr. Johnson and Ms. Robinson's chiropractor. The hearing judge determined that Mr. Johnson's explanation was untrue based on the evidence presented at the hearing.

The hearing judge also concluded that Mr. Johnson violated Rule 1.4(a)(2), (3), and (b) when he failed to keep Ms. Gooden informed about her settlement. Mr. Johnson misled Ms. Gooden about the status of her settlement, misled her by requiring her to sign and notarize an affidavit before issuing her funds, failed to respond to her reasonable requests for information, refused to provide her an accurate settlement disbursement sheet, and failed to explain her settlement "to the extent reasonably necessary to permit [her] to make informed decisions regarding the representation."

39

Mr. Johnson does not except to these conclusions of law. Based on our independent review of the record we agree with the hearing judge's conclusion that Mr. Johnson's conduct violated Rule 1.4.

*3.     Rule 1.15 (Safekeeping Property).*

Rule 1.15 provides in pertinent part:

(a) An attorney shall hold property of clients or third persons that is in an attorney's possession in connection with a representation separate from the attorney's own property. Funds shall be kept in a separate account maintained pursuant to Title 19, Chapter 400 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the attorney and shall be preserved for a period of at least five years after the date the record was created.

(b) An attorney may deposit the attorney's own funds in a client trust account only as permitted by Rule 19-408 (b).

(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, an attorney shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the attorney's own benefit only as fees are earned or expenses incurred.

(d) Upon receiving funds or other property in which a client or third person has an interest, an attorney shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, an attorney shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property.

Put plainly, when an attorney receives a client's settlement funds, "[s]uch funds are to be placed in an attorney trust account in accordance with Maryland Rule 19-404."[27] *Smith-Scott*, 469 at 350 (alteration in original) (quoting *Attorney Grievance Comm'n v. Singh*, 464 Md. 645, 673 (2019)). Therefore, "a violation of Rule 1.15 occurs when the attorney 'does not deposit trust funds into an attorney trust account and does not obtain the client's informed consent to do otherwise.'" *Planta*, 467 Md. at 352 (quoting *Attorney Grievance Comm'n v. Hamilton*, 444 Md. 163, 189–90 (2015)). Moreover, "[t]he mere fact that the balance in an attorney trust account falls below the total amounts held in trust supports a *prima facie* finding of [a] violation of [Rule 1.15]." *Attorney Grievance Comm'n v. Bell*, 432 Md. 542, 552–53 (2013) (alteration in original) (quoting *Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 472 (1996)).

The hearing judge concluded that Mr. Johnson violated Rule 1.15(a) by failing to maintain client funds in an attorney trust account, by allowing his attorney trust account balance to fall below his trust obligations to clients, and by failing to safeguard settlement funds due to clients and third-parties. Mr. Johnson failed to maintain an attorney trust

---

[27] Maryland Rule 19-404 provides:

> Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This Rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person.

account until October 5, 2015, and repeatedly allowed his attorney trust account balance to fall below his trust obligations thereafter. In addition, Mr. Johnson failed to safeguard settlement funds for the following clients: Mr. and Ms. Acquoi, Ms. Bell, Ms. Byrd, Ms. Frosolone, Mr. Feustel, Ms. Fultz, Mr. Glover, Ms. Gooden, Ms. Heaven, Ms. Hernandez, Mr. Hernandez, Ms. McCollum, Mr. and Ms. Patterson, Ms. Price, Ms. Robinson, Mr. Ross, Mr. Sandoval, Mr. Taylor, and Mr. Weefur. Mr. Johnson also failed to safeguard funds due to third-parties in Mr. Feustel's, Mr. Weefur's, and Mr. and Ms. Patterson's client matters.

Mr. Johnson excepts to the hearing judge's conclusion that he violated Rule 1.15(a) before December 2015 and contends that he adequately obtained informed consent to deposit his clients' funds into an operating account other than an attorney trust account. However, the hearing judge correctly reviewed the retainer agreements admitted into evidence and determined that—although Mr. Johnson provided notice that he did not intend to hold client funds as early as April 28, 2013—his December 2014 retainer agreement no longer contained similar language. The hearing judge declined to make a finding that Mr. Johnson failed to obtain informed consent prior to his December 2014 retainer agreement, and only found that he violated Rule 1.15(a) by failing to obtain his clients' informed consent between December 2014 and October 5, 2015—when he opened an attorney trust account.

We are not convinced that Mr. Johnson's December 2014 retainer agreement, and those thereafter, provided adequate notice for Mr. Johnson to obtain his clients' informed consent to deposit their settlement funds into an operating account other than an attorney

42

trust account. "Informed consent requires an attorney to give a client 'any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's options and alternatives.'" *Attorney Grievance Comm'n v. Lang*, 461 Md. 1, 50–51 (2018). No such explanation was provided to clients after December 2014, therefore, the hearing judge's determination that Mr. Johnson violated 1.15(a) was not clearly erroneous.

The hearing judge also concluded that Mr. Johnson violated Rule 1.15(b) by failing to promptly remove earned attorney's fees from his attorney trust account. We have "consistently held that 'an attorney's failure to withdraw earned fees from his or her trust account in a timely manner results in an impermissible commingling of funds violative of [Rule 1.15(a).]'" *Attorney Grievance Comm'n v. McLaughlin*, 456 Md. 172, 195 (2017) (quoting *Attorney Grievance Comm'n v. Weiers*, 440 Md. 292, 305 (2014)). Mr. Johnson failed to timely remove his earned attorney's fee in connection with the following client matters: Fran Delgado, Chauncey Johnson, Jr., Charles Johnson, Ms. Byrd, Ms. Frosolone, Ms. Heaven, Ms. Hernandez, Ms. Robinson, and Mr. Weefur.[28] We therefore find that, although the hearing judge correctly found that Mr. Johnson's repeated failure to promptly withdraw his earned fee in client matters violates Rule 1.15(b), his conduct also violates Rule 1.15(a).

---

[28] Mr. Johnson's representations of Fran Delgado, Chauncey Johnson, Jr., and Charles Johnson were not outlined by the hearing judge in her findings of fact and conclusions of law.

Lastly, the hearing judge concluded that Mr. Johnson violated 1.15(d) by failing to promptly notify Ms. Robinson and Ms. Gooden about the status of their settlement funds and by failing to promptly remit funds due to clients. Rule 1.15(d) "requires that an attorney, upon receiving funds or other property in which a client or third party has an interest, promptly notify the client or third person and deliver promptly . . . any funds or other property to which they are entitled." *Attorney Grievance Comm'n v. Smith*, 443 Md. 351, 373–74 (2015) (internal quotation marks omitted). Mr. Johnson failed to promptly remit settlement funds to the following clients: Ms. Bell, Ms. Byrd, Mr. Feustel, Ms. Frosolone, Ms. Fultz, Mr. Glover, Ms. Gooden, Ms. Heaven, Ms. Hernandez, Mr. Hernandez, Mr. and Ms. Patterson, Ms. Price, Ms. Robinson, Mr. Ross, Mr. Sandoval, Mr. Taylor, and Mr. Weefur. The hearing judge also concluded that Mr. Johnson violated Rule 1.15(d) when he failed to promptly remit funds due to third-parties in Mr. and Ms. Patterson's, Mr. Weefur's, and Mr. Feustel's client matters.

Mr. Johnson does not object to the hearing judge's conclusion that he violated Rule 1.15(b), and (d). We determined that Mr. Johnson's failure to timely remove his earned fee from his attorney trust account was, as we have previously held, a violation of 1.15(a) as well as a violation of Rule 1.15(b). Mr. Johnson takes exception to the hearing judge's conclusion that he violated Rule 1.15(a) prior to December 2015, but we overrule his exception. Accordingly, our independent review of the record confirms that clear and convincing evidence supports the hearing judge's conclusion that Mr. Johnson violated Rule 1.15(a), (b), and (d).

*4. Rule 5.3 (Responsibilities Regarding Non-Attorney Assistants).*

Rule 5.3 provides in pertinent part:

> With respect to a non-attorney employed or retained by or associated with an attorney:
>
> (a) a partner, and an attorney who individually or together with other attorneys possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the attorney;
>
> (b) an attorney having direct supervisory authority over the non-attorney shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the attorney;
>
> (c) an attorney shall be responsible for conduct of such a person that would be a violation of the Maryland Attorneys' Rules of Professional Conduct if engaged in by an attorney if:
>
>> (1) the attorney orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
>> (2) the attorney is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action[.]

The hearing judge concluded that Mr. Johnson violated Rule 5.3(c) because he ratified Mr. Clarke's conduct, which included making unauthorized transfers from Mr. Johnson's attorney trust to Account #6070 and using a debit card associated with that account to steal funds.

Mr. Johnson excepts to the hearing judge's conclusion that he violated Rule 5.3(c). Mr. Johnson contends that he did not know about Mr. Clarke's misconduct at a time when it could have been mitigated and that he took immediate remedial action upon learning of

45

the misconduct. While we defer to the hearing judge's determination that Mr. Johnson knew or should have known about Mr. Clarke's actions, the hearing judge failed to take Mr. Johnson's remedial actions into account in concluding that Mr. Johnson violated Rule 5.3(c). In *Attorney Grievance Comm'n v. Smith*, this Court addressed misconduct perpetrated by a non-attorney employee under of Rule 5.3(c) and explained that:

> Under [Rule] 5.3(c)(2), four elements must be present to impute an employee's misconduct to an attorney: (1) misconduct by the employee that would violate the [MARPC] if done by the attorney; (2) partnership status or a direct supervisory relationship; (3) the attorney's knowledge of the wrongdoing at a time when its consequences can be mitigated; and (4) the attorney's failure to take reasonable remedial action.

443 Md. at 380. As is the case, we have "rarely found an attorney responsible for a non-lawyer employee's misconduct under [Rule 5.3(c)(2)]." *Id.* at 379.

The hearing judge did not explicitly analyze the four elements set out in *Smith* to determine that Mr. Johnson violated Rule 5.3(c). We do so here. Mr. Clarke's alleged conduct would certainly violate the Rules if he was an attorney, and it is clear from the record that Mr. Johnson was Mr. Clarke's direct supervisor. Further, the hearing judge discredited Mr. Johnson's testimony that he was unaware of Mr. Clarke's actions because Mr. Johnson had control over Account #6070. Mr. Johnson also continued to receive settlement checks and issue settlement funds to clients from his attorney trust account during Mr. Clarke's alleged misappropriation. It therefore follows that Mr. Johnson knew about, or should have known about, Mr. Clarke's actions at a time in which he could have mitigated their consequences. However, the hearing judge erred in failing to consider the remedial actions taken by Mr. Johnson to ensure that all of his clients were made whole.

46

The hearing judge's failure to consider Mr. Johnson's remedial actions forecloses this Court from imputing Mr. Clarke's actions to Mr. Johnson.

Therefore, based on an independent review of the record, we sustain Mr. Johnson's exception to the hearing judge's conclusion that he violated Rule 5.3(c).

5.      *Rule 8.4 (Misconduct).*

Rule 8.4 provides in pertinent part:

> It is professional misconduct for an attorney to:
>
> (a) violate or attempt to violate the Maryland Attorneys' Rules of Professional Conduct, knowingly assist or induce another to do so or, do so through the acts of another;
>
> (b) commit a criminal act that reflects adversely on the attorney's honesty, trustworthiness or fitness as an attorney in other respects;
>
> (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
>
> (d) engage in conduct that is prejudicial to the administration of justice[.]

An attorney violates Rule 8.4(a) when he or she violates other Rules of Professional Conduct. *See Attorney Grievance Comm'n v. Hensley*, 467 Md. 669, 684 (2020); *see also Attorney Grievance Comm'n v. Foltz*, 411 Md. 359, 395 (2009). "Under Rule 8.4(c), '[i]t is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.'" *Attorney Grievance Comm'n v. McDonald*, 437 Md. 1, 39 (2014) (alteration in original). Rule 8.4(c) therefore encompasses a "broad universe of mis-behavior." *Id.* When an attorney conceals material information from a client, that action constitutes a misrepresentation that violates Rule 8.4(c). *Attorney Grievance*

47

*Comm'n v. Rand*, 445 Md. 581, 640 (2015) (citing *Attorney Grievance Comm'n v. Brown*, 426 Md. 298, 324 (2012)).

"[C]onduct prejudicial to the administration of justice," in violation of Rule 8.4(d), occurs when an attorney acts in a way that "reflects negatively on the legal profession and sets a bad example for the public at large[.]" *Attorney Grievance Comm'n v. Goff*, 399 Md. 1, 22 (2007). We have found that "an attorney violate[s] Rule 8.4(d) by failing to keep his [or her] client advised of the status of the representation . . . 'which tends to bring the profession into disrepute.'" *Attorney Grievance Comm'n v. Bleecker*, 414 Md. 147, 175 (2010) (quoting *Attorney Grievance Comm'n v. Rose*, 391 Md. 101, 111 (2006)).

The hearing judge determined that Mr. Johnson violated Rule 8.4 in the following ways:

- Mr. Johnson violated Rule 8.4(a) by violating Rules 1.1 and 1.15.[29]

- Mr. Johnson violated Rule 8.4(c) when he misrepresented the amount of settlement proceeds that Ms. Gooden was entitled to receive on January 13, 2017.[30]

- Mr. Johnson violated Rule 8.4(c) when he misrepresented to Ms. Gooden why he was issuing her a second check for $3,727.62 in August 2017.

- Mr. Johnson violated Rule 8.4(c) when he misrepresented to Ms. Gooden that he could not issue her the $3,727.62 settlement check in August 2017 unless she signed and notarized an affidavit stating that Mr. Johnson had competently represented her.

---

[29] Mr. Johnson also violated Rule 8.4(a) by violating Rules 1.4, and 8.4(c) and (d).

[30] We sustained Mr. Johnson's exception to the hearing judge's finding that he made misrepresentations to Ms. Gooden regarding her $2,000 payment in January 2017. This conclusion is therefore clearly erroneous. Nonetheless, Mr. Johnson's further misrepresentations to Ms. Gooden, and those made to other clients, satisfy us he violated Rule 8.4(c).

48

- Mr. Johnson violated Rule 8.4(c) when he misrepresented the status of Ms. Robinson's settlement funds by telling her that he was still waiting for her settlement check to be issued after he had already deposited it.

- Mr. Johnson violated Rule 8.4(c) when he misrepresented the status of Ms. Gooden's settlement funds by telling her that he was still waiting for her settlement check to be issued after he had already deposited it.

- Mr. Johnson violated Rule 8.4(c) when he issued Ms. Robinson a $4,508 settlement check and a settlement disbursement sheet despite his $5,663 trust obligation.

- Mr. Johnson violated Rule 8.4(c) when, in November 2017, he misrepresented to Ms. Robinson that her chiropractor had issued a refund from a payment discrepancy between himself and the chiropractor.

- Mr. Johnson violated Rule 8.4(d) by failing to keep several clients, including Ms. Robinson and Ms. Gooden, advised of the status of their respective representations and by failing to diligently represent those clients' interests.

Mr. Johnson does not except to the hearing judge's conclusions regarding Rule 8.4.

Based on our independent review of the record, we agree with the hearing judge that Mr. Johnson's conduct violated Rule 8.4(a), (c), and (d).

6. *Maryland Rule 16-603 (Duty to Maintain).*

Rule 16-603, which was in effect until July 1, 2016, requires that:

An attorney or the attorney's law firm shall maintain one or more attorney trust accounts for the deposit of funds received from any source for the intended benefit of clients or third persons. The account or accounts shall be maintained in this State, in the District of Columbia, or in a state contiguous to this State, and shall be with an approved financial institution. Unless an attorney maintains such an account, or is a member of or employed by a law firm that maintains such an account, an attorney may not receive and accept funds as an attorney from any source intended in whole or in part for the benefit of a client or third person.

The hearing judge determined that Mr. Johnson violated Rule 16-603 when he failed to maintain an attorney trust account from December 2014 through October 5, 2015. Mr. Johnson does not except to this conclusion. Based on our independent review of the record, we agree with the hearing judge that Mr. Johnson's conduct violated Rule 16-603.

7.      *Maryland Rule 16-604 (Trust Account—Required Deposits).*

Rule 16-604, which was in effect until July 1, 2016, requires that:

Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This Rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person.

The hearing judge determined that Mr. Johnson violated Rule 16-604 when he failed to deposit and maintain his clients' settlement funds in an attorney trust account from December 2014 through October 5, 2015, when Mr. Johnson opened an IOLTA attorney trust account at Bank of America. Mr. Johnson does not except to this conclusion. Based on our independent review of the record, we agree with the hearing judge that Mr. Johnson violated Rule 16-604.

8.      *Maryland Rule 19-408 (Commingling of Funds).*

Rule 19-408[31] provides in pertinent part:

---

[31] Rule 16-607 prior to July 1, 2016.

(a) General Prohibition. An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 19-404 or permitted to be so deposited by section (b) of this Rule.

The hearing judge determined that Mr. Johnson violated Rule 19-408 when he failed to promptly remove earned attorney's fees from his attorney trust account in several client matters. Mr. Johnson does not except to this conclusion. Based on our independent review of the record, we agree with the hearing judge that Mr. Johnson violated Rule 19-408.

9.      *Maryland Rule 19-410 (Prohibited Transactions).*

Rule 19-410[32] provides in pertinent part:

(a) Generally. An attorney or law firm may not borrow or pledge any funds required by the Rules in this Chapter to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose.

\*\*\*

(c) Negative Balance Prohibited. No funds from an attorney trust account shall be disbursed if the disbursement would create a negative balance with regard to an individual client matter or all client matters in the aggregate.

The hearing judge determined that Mr. Johnson violated Rule 19-410 when he issued a $2,500 check to "Whosoever Will Christian Church" and created a negative client ledger balance for Mr. Taylor. The hearing judge also determined that, three months later, in April 2017, Mr. Johnson again created a negative account balance in his attorney trust account. Mr. Johnson does not except to this conclusion. Based on our independent review of the record, we agree with the hearing judge that Mr. Johnson violated Rule 19-410.

---

[32] Rule 16-609 prior to July 1, 2016.

**SANCTION**

As we have often stated, the purpose of attorney disciplinary proceedings is not to simply punish the lawyer, but to protect the public and deter other lawyers from engaging in misconduct. *See Attorney Grievance Comm'n v. Yi*, 470 Md. 464, 499 (2020) (citing *Woolery*, 456 Md. at 497–98). "The public is protected when sanctions are 'commensurate with the nature and gravity of the violations and the intent with which they were committed.'" *Smith-Scott*, 469 Md. at 363 (quoting *Attorney Grievance Comm'n v. Pennington*, 387 Md. 565, 596 (2005)).

Bar Counsel recommends that we disbar Mr. Johnson for his numerous instances of financial mismanagement and deceitful conduct in connection with his personal injury client representations. Mr. Johnson, instead, argues that a 30-day suspension is a more appropriate sanction because he was inexperienced in the practice of law, was suffering from symptoms associated with his GIST tumor, and was being taken advantage of by a non-attorney employee who was his relative.

"In fashioning an appropriate sanction in attorney disciplinary proceedings, '[w]e determine the appropriate sanction by considering the facts of the case, as well as balancing any aggravating or mitigating factors.'" *Sanderson*, 465 Md. at 67 (quoting *Attorney Grievance Comm'n v. Kremer*, 432 Md. 325, 337 (2013)). Accordingly, our consideration of aggravating and mitigating facts "can be critical in the selection of an appropriate sanction." *Yi*, 470 Md. at 500.

52

This Court has also emphasized that "[a]ggravating factors[33] militate in favor of a more severe sanction[.]" *Smith-Scott*, 469 Md. at 364 (some alteration in original) (quoting *Sanderson*, 465 Md. at 67). The existence of aggravating factors must be demonstrated by clear and convincing evidence. *See Attorney Grievance Comm'n v. Edwards*, 462 Md. 642, 708 (2019). The hearing judge found that Mr. Johnson's dishonest or selfish motive in making misrepresentations to clients about their settlements was the sole aggravating factor.

Mr. Johnson contends that the hearing judge erred in finding that he acted with a selfish or dishonest motive, however, the record belies Mr. Johnson's argument. Mr. Johnson primarily relies on the hearing judge's declination to make a finding as to who misappropriated funds from Mr. Johnson's attorney trust account, which proports to show that Mr. Johnson did not act in a dishonest or deceitful manner towards his clients.

---

[33] Aggravating factors include:

> (1) prior attorney discipline; (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple violations of the [Rules]; (5) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with the Maryland Rules or orders of this Court or the hearing judge; (6) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding; (7) a refusal to acknowledge the misconduct's wrongful nature; (8) the victim's vulnerability; (9) substantial experience in the practice of law; (10) indifference to making restitution or rectifying the misconduct's consequences; (11) illegal conduct, including that involving the use of controlled substances; and (12) likelihood of repetition of the misconduct.

*Attorney Grievance Comm'n v. Hoerauf*, 469 Md. 179, 216 (2020) (quoting *Attorney Grievance Comm'n v. Sperling & Sperling*, 459 Md. 194, 275 (2018)).

However, the hearing judge did not need to make such a finding to determine that Mr. Johnson acted selfishly and dishonestly in making misrepresentations to Ms. Robinson and Ms. Gooden about their settlements. Mr. Johnson made these misrepresentations because he failed to adhere to fundamental standards in administering his law practice and maintaining his attorney trust account.

Although Mr. Johnson may not have misappropriated funds on his own accord, he acted in a deceitful manner by selfishly lying to his clients to prolong the time in which he had to remit their settlement funds. Mr. Johnson went one step further during Ms. Gooden's representation and misrepresented to her that, to receive her settlement funds, she needed to sign and notarize a document essentially stating that Mr. Johnson provided competent representation. Bar Counsel therefore proved the existence of a selfish and dishonest motive in accord with the standards of Maryland Rule 19-727(c).

"Unlike aggravating factors, 'the existence of mitigating factors[34] tends to lessen or reduce the sanction an attorney may face.'" *Smith-Scott*, 469 Md. at 365 (quoting

---

[34] Mitigating factors include:

> (1) the absence of prior attorney discipline; (2) the absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith efforts to make restitution or to rectify the misconduct's consequences; (5) full and free disclosure to Bar Counsel or a cooperative attitude toward the attorney discipline proceeding; (6) inexperience in the practice of law; (7) character or reputation; (8) a physical disability; (9) a mental disability or chemical dependency, including alcoholism or drug abuse, where: (a) there is medical evidence that the lawyer is affected by a chemical dependency or mental disability; (b) the chemical dependency or mental disability caused the misconduct; (c) the lawyer's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of

*Sanderson*, 465 Md. at 70). If an attorney presents mitigating factors, they must prove them by a preponderance of the evidence. *Sanderson*, 465 Md. at 70. The hearing judge found that Mr. Johnson's lack of prior attorney discipline was the sole mitigating factor. Mr. Johnson asserts that the hearing judge erred in failing to consider the following mitigating factors: (1) Mr. Johnson's cooperation with Bar Counsel; (2) Mr. Johnson's inexperience in the practice of law; (3) Mr. Johnson's willingness to take responsibility for his actions and demonstrated remorse; (4) Mr. Johnson's efforts to make restitution; (5) the absence of delay in the attorney grievance proceeding; (6) the remoteness of Mr. Johnson's violations; (7) Mr. Johnson's concession that he violated Rule 1.15(a); (8) that Mr. Johnson was previously investigated by the Attorney Grievance Commission and cleared of wrongdoing; and (9) Mr. Johnson's good character and pro bono work.

Mr. Johnson correctly asserts that the hearing judge should have considered his inexperience, cooperation with Bar Counsel, willingness to take responsibility, and efforts to make restitution. The record demonstrates by a preponderance of the evidence that Mr. Johnson was an inexperienced attorney who had just transitioned to the full-time practice of law when his transgressions occurred. Moreover, the record indicates that Mr. Johnson was cooperative with Bar Counsel during its investigation, and Bar Counsel conceded at

_____

successful rehabilitation; and (d) the recovery arrested the misconduct, and the misconduct's recurrence is unlikely; (10) delay in the attorney discipline proceeding; (11) the imposition of other penalties or sanctions; (12) remorse; (13) remoteness of prior violations of the [MARPC]; and (14) unlikelihood of repetition of the misconduct.

*Attorney Grievance Comm'n v. Maldonado*, 463 Md. 11, 49 n.9 (2019) (quoting *Attorney Grievance Comm'n v. Allenbaugh*, 450 Md. 250, 277–78 (2016)).

the evidentiary hearing that they never alleged that he was uncooperative. We are satisfied that Mr. Johnson met his burden of demonstrating a cooperative attitude towards Bar Counsel's investigation.

We are also satisfied that Mr. Johnson met his burden of demonstrating a willingness to take responsibility for his actions and make restitution. The record indicates that Mr. Johnson fired Mr. Clarke after he learned of his alleged actions, and no further mismanagement of Mr. Johnson's trust account occurred thereafter. Further, Mr. Johnson took responsibility for failing to maintain an attorney trust account when he conceded below that his conduct violated Rule 1.15(a). Lastly, and perhaps most significantly, Mr. Johnson proved by a preponderance of the evidence that all of his clients were paid restitution and made whole, even if that meant foregoing his earned fee. The hearing judge did not make a finding that Mr. Johnson misappropriated client funds and each client, although often belatedly, received their owed settlement funds. We therefore agree with Mr. Johnson that, in addition to his lack of disciplinary history, he is entitled to the above mitigating factors in our consideration of his sanction.

Despite this, we disagree that Mr. Johnson's GIST tumor was a mitigating factor. In *Smith-Scott*, we explained that, in cases involving misrepresentations and deceit:

> [W]e will not accept, as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the [Rules of Professional Conduct.]

56

469 Md. at 366 (some alteration in original) (quoting *Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 413–14 (2001)). As we explained earlier, we find no clear error in the hearing judge's finding that Mr. Johnson "did not introduce any credible evidence establishing that he was experiencing any symptoms [of his GIST tumor]" during the time that funds were being misappropriated from his attorney trust account. We therefore find that Mr. Johnson did not prove by a preponderance of the evidence that his GIST tumor was a mitigating factor.

"We have held that the sanction for misappropriation of client funds is disbarment absent compelling extenuating circumstances justifying a lesser sanction[.]" *Attorney Grievance Comm'n v. Calhoun*, 391 Md. 532, 573 (2006) (quoting *Zuckerman*, 386 Md. at 376). However, "[i]n a case of misappropriated client funds, 'where there is no finding of intentional misappropriation . . . and where the misconduct did not result in financial loss to any of the [attorney's] clients, an indefinite suspension ordinarily is the appropriate sanction.'" *Attorney Grievance Comm'n v. Tun*, 428 Md. 235, 247 (2012) (quoting *Calhoun*, 391 Md. at 572). We have accordingly stated:

> Although ignorance does not excuse a violation of disciplinary rules, a finding with respect to the intent with which a violation was committed is relevant on the issue of the appropriate sanction. This is consistent with the purpose of a disciplinary proceeding: to protect the public, as well as to promote general and specific deterrence.

*DiCicco*, 369 Md. at 687 (quoting *Attorney Grievance Comm'n v. Awuah*, 346 Md. 420, 435 (1997)).

Here, although client funds were misappropriated from Mr. Johnson's attorney trust account, the hearing judge declined to make a finding as to who misappropriated those

funds. Nonetheless, based on the hearing judge's findings, Mr. Johnson knew or should have known that funds were being misappropriated from his attorney trust account because he continued depositing client settlement checks into that account and issuing checks drawn on that account to clients. While Mr. Johnson's lack of intentional conduct suggests that our sanction should be in the realm of an indefinite suspension, rather than disbarment, we must also consider Mr. Johnson's other violations, including his misrepresentations to clients.

As explained above, Mr. Johnson engaged in a dishonest and selfish manner by making misrepresentations to his clients. In *Attorney Grievance Comm'n v. Smith*, this Court quoted *Attorney Grievance Comm'n v. Vanderlinde* in articulating how it generally views intentional dishonesty perpetrated by an attorney:

> Upon reflection as a Court, in disciplinary matters, we will not in the future attempt to distinguish between the degrees of intentional dishonesty based upon convictions, testimonials or other factors. Unlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse.

457 Md. at 223 (quoting 364 Md. at 418). As is the case, dishonest conduct usually warrants disbarment. *Id.* Bar Counsel accordingly compares this case to *Smith* in asking us to disbar Mr. Johnson. *Id.* at 177. However, we do not find that Mr. Johnson's conduct rises to the level of disbarment.

Despite our general pronouncement that intentionally dishonest conduct calls for disbarment, we indefinitely suspended an attorney in *Attorney Grievance Comm'n v. Lang* despite "clearly dishonest and deceitful [conduct]." 461 Md. at 75. We did so because,

58

although such conduct "usually results in disbarment," the existence of "'sufficient mitigation' militated against disbarment." *Id.* (quoting *Attorney Grievance Comm'n v. Hecht*, 459 Md. 133, 158 (2018)). Although we disagree with Bar Counsel as to the appropriate sanction, we note that Mr. Johnson exhibited a pattern of egregious conduct. Thus, we also disagree with Mr. Johnson's assertion that his misconduct, compared to cases like *Attorney Grievance Comm'n v. Singh* or *Attorney Grievance Comm'n v. Thompson*, warrants a 30-day suspension. 464 Md. 645 (2019); 462 Md. 112 (2018).

While we recognize the presence of an aggravating factor, we find that there is sufficient mitigation here that militates against disbarment. The hearing judge found that Mr. Johnson has no prior disciplinary history, and we further determined that his inexperience, cooperation with Bar Counsel, and willingness to take responsibility are all mitigating factors. Additionally, we determined that Mr. Johnson's act of providing restitution serves as a mitigating factor because all of his clients were made whole. Lastly, the record supports Mr. Johnson's assertion that no further mismanagement of his law practice or attorney trust account occurred after he fired Mr. Clarke.

In all, given Mr. Johnson's violations, it is clear that his conduct failed to adhere to fundamental standards in administering his law practice and maintaining his attorney trust account. However, upon our independent review, we conclude that an indefinite suspension with the right to reapply after one year is the proper sanction, providing that Mr. Johnson completes a course emphasizing the responsible maintenance of an attorney

trust account.  For these reasons, we indefinitely suspend Mr. Johnson from the practice of

law with the right to reapply after one year.[35]

## CONCLUSION

Based on our assessment of Mr. Johnson's misconduct, the existence of an

aggravating factor, and the existence of several mitigating factors, we disagree with Bar

Counsel that Mr. Johnson should be disbarred.  However, we also disagree that Mr.

Johnson's preferred 30-day suspension adequately protects the public and deters future

violations similar to those made by Mr. Johnson.  For the above reasons, we suspend Mr.

Johnson from the practice of law indefinitely with the right to reapply after one year,

providing that he completes a course emphasizing the proper maintenance of an attorney

trust account.  The suspension shall begin 30 days after the date on which this opinion is

filed.

**IT IS SO ORDERED.  RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST**

---

[35] Under Maryland Rule 19-709(a), the prevailing party in an attorney discipline matter is entitled to "reasonable and necessary" costs.  *See Sperling & Sperling*, 459 Md. at 285.  As the prevailing party, the Attorney Grievance Commission is entitled to costs.  However, Mr. Johnson contends that the costs awarded should be reduced by $6,505—the cost of three separate court reporter invoices—based on the costs he expended defending violations that were either dismissed or disproven.  We decline to reduce the amount of costs awarded because the items that Mr. Johnson seeks to exclude were "reasonable and necessary" to litigate the claims brought against him.

**CHAUNCEY BAYARCULUS JOHNSON.**

Circuit Court for Prince George's County
Case No. CAE19-09143

Argued: October 29, 2020

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 63

September Term, 2018

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

CHAUNCEY BAYARCULUS JOHNSON

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Dissenting Opinion by Watts, J.

_____

Filed: March 16, 2021

Respectfully, I dissent as to the sanction imposed in this case. I would follow Bar Counsel's recommendation and disbar Chauncey Bayarculus Johnson, Respondent.[1] From my perspective, the sanction of an indefinite suspension with the right to apply for reinstatement after one year provided that Johnson complete a course emphasizing the responsible maintenance of an attorney trust account is not appropriate, given the numerous instances of intentional dishonest conduct and the lack of compelling extenuating circumstances justifying a sanction less than disbarment.

Chief among other misconduct, Johnson violated Maryland Attorneys' Rule of Professional Conduct ("MARPC")[2] 8.4(c) (Dishonesty, Fraud, Deceit, or Misrepresentation) with respect to client matters by making multiple misrepresentations to the clients. See Maj. Slip Op. at 48-49. With respect to one client, Johnson violated MARPC 8.4(c) by misrepresenting the amount of settlement proceeds that the client was entitled to receive, by misrepresenting to the client why he was issuing a second settlement check, by misrepresenting to the client that he could not issue the second settlement check unless the client signed and notarized an affidavit stating that he had competently represented the client, and by misrepresenting the status of the client's settlement funds by telling the client that he was still waiting for the issuance of the settlement check when in

---

[1]Johnson requests a thirty-day suspension.

[2]As the Majority notes, effective July 1, 2016, the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") were renamed the MARPC and recodified without substantive change in Title 19 of the Maryland Rules. See Maj. Slip Op. at 3 n.3. Johnson's misconduct occurred before and after recodification of the MLRPC. See Maj. Slip Op. at 3 n.3. Because there are no substantive differences between the MLRPC and MARPC, I refer to the MARPC.

fact he had already deposited the check. See Maj. Slip Op. at 48-49. Johnson violated MARPC 8.4(c) with respect to another client by misrepresenting the status of the client's settlement funds by telling her that he was waiting for the settlement check to be issued when in actuality he had already deposited the check, by issuing a settlement check to the client in an amount less than what was owed to the client and preparing a settlement disbursement sheet that reflected the lower amount, and by misrepresenting to the client that her medical provider had issued a refund from a payment discrepancy between himself and the medical provider. See Maj. Slip Op. at 48-49.

In addition to the numerous violations of MARPC 8.4(c), Johnson violated multiple other MARPC and several Maryland Rules over a period of time, namely MARPC 1.1 (Competence), 1.4(a)(2), (a)(3), and (b) (Communication), 1.15(a), (b), and (d) (Safekeeping Property), 8.4(d), and Maryland Rules 16-603 (Duty to Maintain), 16-604 (Trust Account—Required Deposits), 19-408 (Commingling of Funds), and 19-410 (Prohibited Transactions). Compounding the circumstances, Johnson's misconduct is aggravated by a dishonest or selfish motive. See Maj. Slip Op. at 53-54. The majority opinion states:

> Although [] Johnson may not have misappropriated funds on his own accord, he acted in a deceitful manner by selfishly lying to his clients to prolong the time in which he had to remit their settlement funds. [] Johnson went one step further during [one client]'s representation and misrepresented to her that, to receive her settlement funds, she needed to sign and notarize a document essentially stating that [] Johnson provided competent representation. Bar Counsel therefore proved the existence of a selfish and dishonest motive in accord with the standards of Maryland Rule 19-727(c).

Maj. Slip Op. at 54.

As to mitigating circumstances, the Majority concludes, and I agree, that Johnson's misconduct is mitigated by the absence of prior attorney discipline, inexperience in the practice of law, a cooperative attitude towards Bar Counsel's investigation, and a willingness to take responsibility for his actions and to make restitution. See Maj. Slip Op. at 55-56. I also agree with the Majority that Johnson did not prove by a preponderance of the evidence a mitigating factor in the form of his GIST tumor. See Maj. Slip Op. at 56-57.

Even with the mitigating circumstances, with which I agree, it is clear that disbarment is the appropriate sanction in this case. This case involves an attorney "knew or should have known" that funds were being misappropriated from his attorney trust account given that he continued depositing client settlement checks into the account and issuing checks to clients drawn from the account. Maj. Slip Op. at 58. To cover up that misappropriation, Johnson misled his clients about the receipt of their settlement funds and attempted to play catch up by disbursing funds to clients much later than when he had deposited them.

At bottom, Johnson received settlement funds on behalf of his clients, did not tell his clients that he had received the funds, and actively misled (deceived) his clients by misrepresenting that he had not received the funds and by misrepresenting the amounts to which the clients were entitled. And he did all of this with the dishonest or selfish motive to hide the reality of the misappropriation from his clients and prolong the time in which he had to remit their settlement funds. That Johnson himself may not have misappropriated the funds or lacked the intent to do so does not negate or absolve him of engaging in

intentionally dishonest conduct, *i.e.*, making numerous intentional misrepresentations to clients about their settlement funds over a protracted period of time to hide other misconduct. There was no lack of intent with respect to the misrepresentations Johnson made to his clients, especially when he knew or should have known what was going on with his attorney trust account and misled his clients as a result.

Because Johnson engaged in intentionally dishonest conduct by making multiple misrepresentations to clients—and had a dishonest or selfish motive in doing so—compelling extenuating circumstances are necessary to justify a sanction other than disbarment. See Attorney Grievance Comm'n v. Miller, 467 Md. 176, 228, 223 A.3d 976, 1006 (2020). The mitigating factors present in the case fall far short of circumstances that would constitute compelling extenuating circumstances. Under this Court's holding in Attorney Grievance Comm'n v. Vanderlinde, 364 Md. 376, 413-14, 418, 773 A.2d 463, 485, 488 (2001), the lack of compelling extenuating circumstances alone is sufficient to warrant disbarment for intentional dishonest conduct.

Johnson's misconduct, though, includes not only numerous instances of intentional dishonest conduct in the form of misrepresentations (dishonesty), but also other forms of misconduct, including a lack of competence, the failure to properly communicate with clients, and the failure to properly maintain client funds and his attorney trust account. Disbarment is the appropriate sanction in this case given that, in addition to Johnson's multiple instances of intentional dishonest conduct, Johnson engaged in additional misconduct that violated numerous other MARPC and Maryland Rules with respect to multiple client matters over a long period of time.

In <u>Vanderlinde</u>, <u>id.</u> at 418, 773 A.2d at 488, this Court announced:

> Upon reflection as a Court, in disciplinary matters, we will not in the future attempt to distinguish between degrees of intentional dishonesty based upon convictions, testimonials or other factors. Unlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character.
>
> Disbarment ordinarily should be the sanction for intentional dishonest conduct. With our opinion today, we impress upon the members of the bar that the Court does not consider [certain prior] cases to be authority for an argument for leniency in attorney disciplinary matters involving intentionally dishonest conduct.

We explained that only compelling extenuating circumstances would justify a sanction less than disbarment in cases of intentional dishonest conduct, stating:

> [We hold] that, in cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct and the like, we will not accept, as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the M[A]RPC. Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct, whether occurring in the practice of law, or otherwise.

<u>Id.</u> at 413-14, 773 A.2d at 485 (emphasis in original).

As we stated recently in <u>Miller</u>, 467 Md. at 228, 223 A.3d at 1006, "disbarment is generally the appropriate sanction for intentionally dishonest conduct, unless an attorney can establish the existence of compelling extenuating circumstances justifying a lesser sanction." (Cleaned up). And, in <u>Attorney Grievance Comm'n v. Cocco</u>, 442 Md. 1, 13, 109 A.3d 1176, 1183 (2015), this Court stated that "we have reached the conclusion that

disbarment is the appropriate sanction for intentional misrepresentations, particularly when they cast disrepute upon the public perception of lawyers." (Citation omitted). Examining Johnson's misconduct, especially his various instances of intentionally dishonest conduct, demonstrates that, under Vanderlinde and its progeny, disbarment is warranted. The premise underlying this Court's holding in Vanderlinde is that we must protect the public from dishonesty and deter lawyers from engaging in intentional dishonesty of the type that Johnson engaged in.

From my perspective, the sanction imposed in this case, and similar ones where there has been intentional dishonest conduct and disbarment was not deemed to be the appropriate sanction, demonstrates that there is a need for the Court to determine whether our holding in Vanderlinde concerning disbarment generally being the appropriate sanction for intentional dishonest conduct remains valid or whether the presence of mitigating factors that do not constitute compelling extenuating circumstances will be sufficient to conclude that disbarment is unwarranted. See, e.g., Attorney Grievance Comm'n v. Riely, 471 Md. 458, 242 A.3d 206 (2020); Attorney Grievance Comm'n v. Lang, 461 Md. 1, 191 A.3d 474 (2018).

If we wish to move away from the Vanderlinde standard and no longer require compelling extenuating circumstances to justify a sanction less than disbarment in cases involving intentional dishonest conduct, then, from my perspective, we should say so. For the sake of clarity in our attorney grievance jurisprudence and providing guidance to Bar Counsel and the Bar at large, we should make known whether we intend to adhere to the principles set forth in Vanderlinde where there is intentional dishonest conduct or not, *i.e.*,

whether <u>Vanderlinde</u> remains good law.

      For the above reasons, respectfully, I dissent.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/63a18agcn.pdf